**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

HARMINDER SINGH,
            *Defendant-Appellant.*

No. 07-30150

D.C. No.
CR-06-00038-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
March 12, 2008—Seattle, Washington

Filed July 17, 2008

Before: Betty B. Fletcher, M. Margaret McKeown, and
Richard A. Paez, Circuit Judges.

Opinion by Judge McKeown

**COUNSEL**

Robert M. Leen, Seattle, Washington, for the defendant-appellant.

Lisca N. Borichewski, United States Attorney, Helen J. Brunner, Assistant United States Attorney, & Ye-Ting Woo, United States Attorney, Seattle, Washington, for the plaintiff-appellee.

**OPINION**

McKEOWN, Circuit Judge:

Harminder Singh was convicted on several counts related to his role in a human smuggling conspiracy. This appeal raises two issues with regard to Singh's conviction for bringing an alien to the United States for the purposes of financial gain. *See* 8 U.S.C. § 1324(a)(2)(B)(ii). Singh contends that there was insufficient evidence to establish that he brought, or

aided and abetted the bringing of, an alien into the United States as alleged in Count 10. He also raises a challenge to his sentence under *Apprendi v. New Jersey*, 530 U.S. 466 (2000). We affirm his conviction and sentence.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In June 2005, Immigration and Customs Enforcement ("ICE") received information from a confidential source regarding a Canada-based organization that was smuggling aliens into the United States from Canada. ICE launched an investigation and also contacted members of the Royal Canadian Mounted Police ("RCMP"). The RCMP began its own investigation and learned from recorded telephone conversations that Kavel Multani, among others, was involved in human trafficking. Singh, a taxi driver living in Washington, was recorded as a participant in some of those conversations.

A grand jury returned a 23-count indictment against Multani, Singh and a number of co-defendants. Singh was charged and convicted on five counts, but only Count 10—Bringing an Illegal Alien into the United States, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2—is at issue here. Count 10 alleged:

> During January 2006, and continuing through on or about January 26, 2006, within the Western District of Washington and elsewhere, KAVEL MULTANI a/k/a YGURU, NIZAR SABAZ-ALI, HARMINDER SINGH a/k/a NICK, and other persons, in knowing and reckless disregard of the fact that approximately one (1) alien had not received prior official authorization to come to, enter and reside in the United States, aided and abetted the bringing of, and did knowingly bring, the alien to the United States for the purpose of private financial gain.

## A.   EVIDENCE AT TRIAL

Although Singh was in touch with others in the smuggling operation over a longer period of time, the key events pertinent to Count 10 began in January 2006. Much of the government's evidence came from translated transcripts of recorded telephone conversations. In a January 23, 2006 telephone conversation with Multani, Singh discussed his desire for work and money owed to him for past work, and also stated that he was grateful for work in the past, but had not received work in months and needed to do something to put food on the table.

Through monitoring of the calls, the RCMP learned that an illegal alien would be taking a particular flight to Vancouver, British Columbia from Toronto on January 24, 2006. On that day, RCMP Constable Steven Glionna conducted surveillance of the flight's arrival and observed a woman, originally identified as Ms. Kahn, but later identified as Alpa Patel, get off the flight with a man later identified as Nizar Sabaz-Ali. Constable Glionna followed Sabaz-Ali from the airport terminal to a black Ford Expedition registered to Multani and then followed the Expedition to a residence in Surrey, British Columbia.

Following up on his earlier inquiry, Singh called Multani on January 26, 2006, at 1:16 p.m., telling Multani that he was calling to "find out if there is some work to do." Multani and Singh then had the following exchange:

> Multani:  I am looking. There was a person.
>
> Singh:    Huh.
>
> . . .
>
> Multani:  It was the ticket-person. I am exploring
>           . . . if can get on in the morning.

Singh:      Ok.

Multani:   He has a book.[1]

Singh:      Ok.

Multani:   Get the ticket and have to go along to drop
           off.

Singh:      Ok.

Multani:   Have to go along to drop off, and bring the
           book back.

Singh:      Yes, babaji, I'll drop off. Where do I have
           to go?

Multani:   Have to bring the book back and give it in
           Vancouver. We have a 2000 contract, if it
           pans out.

Singh:      All right.

Multani:   It is a contract for 2000. I'll see what hap-
           pens. It has not started yet. I talked this
           morning.

Singh:      Baba . . something or the other will hap-
           pen.

Multani:   Yes, something will happen. If nothing
           else, will make four hundred, five hun-
           dred.

Singh:      Yes, abaji.

---

[1]"Book" refers to a passport.

Multani:  Will make something.

Singh:    You send abaji. I'll drop off the person.

Multani:  I'll do it. I was going to call for the ticket
          . . .

At approximately 3:00 p.m. on January 26, Constable Glionna observed Multani, Sabaz-Ali, Patel, and Raman Pathania meet in a parking lot. Patel got into a silver Chrysler Sebring driven by Pathania, joining Pathania's cousin and another alien who was going to be smuggled into the United States.

The RCMP surveillance team followed the Sebring to the border crossing near Blaine, Washington, where the smugglers instructed Patel on how to cross the border. The surveillance team saw Patel and the other alien walk across the border unaccompanied and get into a white Mazda driven by Matthew Dehagi. Dehagi then drove Patel to the Sea-Tac Inn, near the Seattle-Tacoma International Airport, some 120 miles south of the border. ICE agent Hernandez saw the white Mazda arrive at the Sea-Tac Inn, watched Patel exit the Mazda and go into the Sea-Tac Inn, and saw the Mazda leave.

At 6:38 p.m., the RCMP intercepted a telephone call from Pathania to Multani stating that "she" would be in the lobby at the Sea-Tac. A few minutes later, Multani called Singh, telling him "I have sent the person," and "I have fixed it for 2000," and instructing Singh to pick up the woman from the Sea-Tac lobby. Multani also told Singh that "[s]he has to go to New York" and "they'll hand you 2,000 there, you hand over the girl and for sure take the book." Agent Hernandez saw Singh arrive at the Sea-Tac Inn shortly thereafter and drive away with Patel in his taxi. At 9:13 p.m., Singh called Multani to tell him that he had picked up Patel and that the trip to New York would happen in the morning.

The next day, at the Seattle-Tacoma airport, Singh used a credit card to buy two tickets for a flight to New York. When Singh and Patel arrived in New York, Patel's husband met them and, according to the Patels, they paid Singh $2,000. Singh claims they only paid him $150 in taxi fare, though he admitted that he was supposed to receive $2,000. It is undisputed that Singh retained the passport Patel used for travel, presumably to return to the principals in Vancouver, as per the agreement between Singh, Patel and the principals. The jury convicted Singh on five separate counts related to alien smuggling, including Count 10.

### B.   SENTENCING

During the sentencing proceedings, Singh objected to the court's reliance on the jury's special verdict finding of financial motive because the special verdict form did not specify that the jury must find the financial motive beyond a reasonable doubt. In a memorandum regarding penalties, Singh explicitly relied on *Apprendi* to argue that enhanced penalties should not apply to Count 10. The court rejected this argument, calculated a mandatory minimum sentence of three years and an advisory Guidelines range of 37-46 months, and imposed a sentence of 37 months.

## II.   DISCUSSION

### A.   SUFFICIENCY OF THE EVIDENCE AFTER *LOPEZ*

#### 1.   THE SCOPE OF THE "BRINGS TO" OFFENSE AFTER *LOPEZ*

Singh contends that there was insufficient evidence to establish that he brought, or aided and abetted the bringing of, one alien into the United States for the purpose of commercial advantage or private financial gain, in violation of 8 U.S.C. § 1324(a)(2)(B)(ii).[2] There is no dispute that Singh did not

---

[2] 8 U.S.C. § 1324(a)(2) penalizes

Any person who, knowing or in reckless disregard of the fact that

"bring" Patel to the United States. The dispute centers on the aiding and abetting portion of the charge. Specifically, Singh argues that his telephone conversations with people in Canada, ultimately resulting in an agreement for Singh to provide state-side transport and the return of the passport to Canada, were insufficient to sustain a conviction for aiding and abetting the crime of bringing an alien to the United States.

The starting point for our analysis is our recent *en banc* decision in *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007). We begin by noting one critical difference between our case and *Lopez.* We reviewed de novo Lopez's sufficiency of the evidence claim because he had preserved his claim by moving for acquittal at the close of the evidence under Federal Rule of Criminal Procedure 29. *See United States v. Bahena-Cardenas*, 70 F.3d 1071, 1072 (9th Cir. 1995). Because Singh did not preserve this claim of sufficiency of the evidence by moving for acquittal at the close of the evidence, our review is more deferential, requiring reversal "only upon plain error or to prevent a manifest injustice." *United States v. Delgado*, 357 F.3d 1061, 1068 (9th Cir. 2004). In any case, a challenge to the sufficiency of the evidence requires us to determine whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

We began in *Lopez* by observing that in 8 U.S.C. § 1324(a)(1), Congress created four distinct immigration

---

an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such an alien . . . .

*Id.* Under § 1324(a)(2)(B), if such an offense is "done for the purpose of commercial advantage or private financial gain," *id.* at § 1324(a)(2)(B)(ii), then the person shall "be fined under Title 18 and shall be imprisoned . . . not less than 3 nor more than 10 years." *Id.* at (a)(2)(B)(iii).

offenses: "1) bringing an alien to the United States; 2) transporting or moving an illegal alien within the United States; 3) harboring or concealing an illegal alien within the United States; and 4) encouraging or inducing an illegal alien to enter the United States." *Id.* at 1190-91.

Specifically, in *Lopez* we addressed the issue of

> whether a driver who transports a group of illegal aliens from a drop-off point in the United States to another destination in this country commits only the offense of transporting aliens "within" the United States or whether that individual is also guilty of the additional offense of aiding and abetting the crime of 'bringing' the aliens "to" the United States.

*Id.* at 1187. *Lopez* clarified the temporal aspect of "bringing to"[3] the United States and held that:

> although all of the elements of the "bringing to" offense are satisfied once the aliens cross the border, the crime does not terminate until the initial transporter who brings the aliens to the United States ceases to transport them—in other words, the offense continues until the initial transporter drops off the aliens on the U.S. side of the border. At that point the offense ends, regardless of the judicial district in which the termination occurs.

*Id.* at 1187-88.

Because Lopez encountered the aliens and transported them only *after they had been dropped off* in the United States by someone else, her act of transporting the aliens occurred only

---

[3]Following *Lopez*, "we use the terms 'brings to' and 'bringing to' interchangeably when referring to the offense proscribed by § 1324(a)(2). *id.* at 1188 n.1.

after the "brings to" offense was complete and her transportation of the aliens could not, standing alone, support her conviction for bringing an undocumented alien to the United States *or* her conviction for aiding and abetting such an offense. *Id.* at 1198. We concluded that the convictions must "be reversed unless the government can prevail on its second theory, that Lopez acted before the drop-off to aid and abet the extraterritorial offense." *Id.* at 1198-99. This case begins where we left off in *Lopez.*

### 2.  "AIDING AND ABETTING" A "BRINGS TO" OFFENSE AFTER *LOPEZ*

Under the aiding and abetting statute, 18 U.S.C. § 2, a person who "aids, abets, counsels, commands, induces or procures" the commission of an offense against the United States is "punishable as a principal." In this circuit,

> the elements necessary to convict an individual under an aiding and abetting theory are (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent of the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that someone committed the underlying substantive offense.

*United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988). We elaborated on the meaning of aiding and abetting in *Lopez*:

> In *United States v. Zemek,* 634 F.2d 1159 (9th Cir. 1980), we wrote that "[c]onviction as an aider and abettor requires proof the defendant willingly associated himself with the venture and participated therein as something he wished to bring about." *Id.* at 1174. Elsewhere, we have stated that "[a]n abettor

is one 'who, with *mens rea . . .* commands, counsels or otherwise *encourages* the perpetrator to commit the crime.' " *United States v. Barnett,* 667 F.2d 835, 841 (9th Cir. 1982) (quoting ROLLIN M. PERKINS, CRIMINAL LAW 645 (2d ed. 1969)); *see also* Ninth Circuit Model Criminal Jury Instructions § 5.1 (2005) (instructing that, to obtain a conviction for aiding and abetting, the government must prove beyond a reasonable doubt that, *inter alia,* the defendant "knowingly and intentionally aided, counseled, commanded, *induced* or procured [the principal] to commit each element" of the crime charged).

*Lopez*, 484 F.3d at 1199 (emphasis added).

Against this backdrop, we considered the specific evidence tying Lopez to the smuggling operation. *After* completion of the "brings to" offense, Lopez twice spoke to a person who might have been the transporter. This fact alone, however, did not provide sufficient evidence of aiding and abetting because it could not establish that the defendant "knowingly and intentionally commanded, counseled, or encouraged the initial transporter to commit the 'brings to' offense." *Id.* at 1200. Similarly, merely showing that Lopez was associated with someone who was involved with a smuggling operation in some unknown way or that she was associated with the transportation of the aliens within the United States after the fact of smuggling was insufficient to show that she had the specific intent to bring about the "brings to" offense or that she knowingly and intentionally commanded, counseled, or encouraged the initial transporter to commit the "brings to" offense. *Id.* at 1201. We noted that a "brings to" conviction would be "particularly inappropriate" in *Lopez* because the district court found that "the defendant 'wasn't obviously the first choice'—'someone else was supposed to pick [the aliens] up,' " and Lopez was contacted "only after the aliens were already in the country and the plan for the first person to pick them up had been frustrated." *Id.* at 1200. These factors stand

in stark contrast to Singh's involvement in the smuggling venture.

**[1]** Although *Lopez* clarified that a defendant who does not physically transport aliens across the border may be held criminally liable for aiding and abetting a "brings to" offense, *id.* at 1199, *Lopez* did not call for us to elaborate what actions may constitute aiding and abetting a "brings to" offense. We did, however, signal the issue now before us in this case:

> [W]e do not decide that if a smuggling operation "relies on" a secondary, state-side transporter—in the sense that the secondary transporter's agreement to participate induces or encourages the commission of the initial, extraterritorial "brings to" offense and the secondary transporter intended to so induce or encourage the commission of the crime—aiding and abetting liability will never lie. Those are not the facts of this case and we do not consider that question here.

*Id.* at 1201 n.19.

**[2]** Because Singh's act of transporting an alien commenced only after the "brings to" offense was completed, as in *Lopez*, his transportation of Patel, standing alone, cannot sustain his conviction on Count 10. However, in this case, there is much more. We conclude—on the basis of additional evidence that Singh agreed ahead of time not only to assist with secondary state-side transport, but also to return to Vancouver after delivering Patel to New York—that the district court did not plainly err in finding that sufficient evidence supported the conclusion that Singh associated himself with the venture and participated in it as in something he wished to bring about. *Zemek*, 634 F.2d at 1174.

We are especially reluctant to find plain error when this court has expressly left open the question of aiding and abet-

ting liability for participating in secondary state-side transport, without more. *Lopez*, 484 F.3d at 1201 n.19. Indeed, because Singh's involvement *does* encompass more, that question remains unresolved. In concluding that the district court did not plainly err by placing Singh into the category of aiders and abettors that *Lopez* left undefined, we have in mind *Lopez*'s guidance regarding the contours of the offense:

> Any complete specification of the category of aiders and abettors would have to take into account, and attempt to avoid redundancy with, the separate offense Congress created for one who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."

*Id.* at 1199 n.16 (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)).[4]

Our case law is sparse with respect to the "encourages or induces" offense. In our one published decision on this point, the defendant was charged under both § 1324(a)(1)(A)(iv) (encourages and induces) *and* § 1324(a)(2)(B)(ii) (brings to), and the court found the evidence was sufficient to sustain both charges. *See United States v. Yoshida*, 303 F.3d 1145, 1149-52 (9th Cir. 2002) (concluding that the evidence showing that the Yoshida escorted aliens onto a plane to the United States provided sufficient evidence not only of a "brings to" offense, but also of an "encourages or induces" offense).[5]

The "encourages or induces" offense, § 1324(a)(1)(A)(iv),

---

[4]None of the individuals charged in the twenty-three count indictment, including Singh, were charged with violating § 1324(a)(1)(A)(iv).

[5]In *Yoshida*, the defendant was the last in a series of escorts who accompanied several aliens on their journey from the Peoples Republic of China to the United States in three stages, with Yoshida accompanying them on the final leg of the trip from Japan to Los Angeles. *Id.* at 1148.

criminalizes the act of encouraging *the alien herself* to illegally enter or reside in the United States, whereas aiding and abetting the principal in a "bringing to" offense, § 1324(a)(2)(B)(ii), criminalizes the act of aiding, counseling, inducing or encouraging *not the alien but the principal*, the person or venture who is illegally bringing the alien to the United States. Here, Singh aided and abetted the principals in the human smuggling conspiracy, not Patel herself, in committing the "brings to" offense that brought Patel into the United States.

### 3. EVIDENCE SUPPORTING SINGH'S "AIDING AND ABETTING"

[3] Much of the evidence relied upon by the government to support its aiding and abetting theory is insufficient under *Lopez* because it shows that Singh associated with others who were transporting aliens, but falls short of providing details that Singh made arrangements with other smugglers prior to the completion of Patel's transport, and that the principals were induced by his aid to "bring" Patel "to" the country as alleged in Count 10. Nevertheless, at least on plain error review, we are satisfied that the evidence of the events of January 26, 2006 provides sufficient link and detail to allow a rational trier of fact to find the elements of aiding and abetting beyond a reasonable doubt under *Lopez*. In particular, the evidence shows that in the hours before Patel entered the United States, Singh sought smuggling work, sealed a deal on the arrangements for the smuggling, including a return of the false passport that could be used, and agreed to assist fulfilling the smuggling contract for $2000 by traveling with Patel to New York. These details, worked out in advance, were arguably central to the principals' decision to bring Patel to the United States.

[4] Without a doubt, Singh was not a newcomer to the smuggling business when he facilitated the arrangements for Patel in January 2006. In addition to his recruitment of a fel-

low taxi driver into the smuggling operation, Singh himself earlier twice crossed the border into Canada to meet with Raman Pathania, who was part of the Maltani smuggling operation, to discuss developing alternate smuggling routes.

[5] There is also evidence that Singh engaged in preparatory and planning activity in relation to a "bringing to" offense. Harjeevan Parhar, another cooperating defendant, described that during a meeting at a house in Canada, he discussed with Singh and Pathania how aliens would be transported and that "next time or any other time that we would do this legal [sic] activity and smuggling aliens, that all the work would go to Mr. Singh." Singh said that "he wanted the work to go through him, not through anyone else." Parhar also testified that, in January 2006, he took part in a couple of telephone conversations in which Singh asked if there were any more aliens coming. He also heard another member of the conspiracy tell Singh that people were coming and to be ready, though he did not say when this conversation took place. This evidence establishes that Singh sought work for the smuggling operation, and took an active role in coordinating with others in the conspiracy.

[6] Even this background evidence is insufficient standing on its own to show that Singh actually aided and abetted bringing Patel to the United States. However, additional and more specific evidence—a phone conversation in close proximity to Patel's arrival—provides a nexus between Singh's preparatory and collaborative work and the events related to Patel. On January 26, 2006, at 1:16 p.m., prior to Patel's crossing, Singh called Multani, telling Multani that he was calling to "find out if there is some work to do." Multani then informed Singh there was work, and that it "has not started yet." They then had an exchange in which Singh agreed to "drop off" the person and bring back the passport for a fee of $2,000.

Preparation to undertake the transporting of an illegal alien within the United States, in violation of 8 U.S.C. §§ 1324(a)

(1)(A)(ii), 1324(a)(1)(v)(ii), and 1324(a)(1)(B)(I), does not by itself necessarily establish intent to aid a "brings to" offense. For example, in *Lopez*, we rejected the government's similar argument that Lopez's decision to purchase a Ford Expedition in the United States four days before it was used in the offense, and pick up the vehicle on the day she was asked to transport the aliens from a drop-off point in the United States to another domestic destination, established intent to aid a "brings to" offense. *Lopez*, 484 F.3d at 1200. Thus, to the extent that Singh's preparatory calls involved planning for the transporting of an illegal alien within the United States, they are not enough to establish intent to aid a "brings to" offense. The calls are relevant, however, to Singh's participation in an overall "brings to" scheme. Likewise, even the *commission* of the crime of transporting of an illegal alien within the United States does not, by itself, establish intent to aid a "brings to" offense. Thus, the fact that Patel crossed the border and was delivered to the Sea-Tac Inn, Singh picked up Patel from the hotel, drove her to the airport, bought her an airplane ticket with a credit card, and escorted her to New York is still not enough, without more, to establish sufficient evidence to support the conviction.

**[7]** However, there is more. The "work" that Singh agreed to do prior to the start of the "brings to" offense included not just work assisting with state-side transport, but also included bringing the passport back to the principals in Canada. When Multani described the "work," he stated that Singh would "have to go along to [with Patel to the] drop off, and bring the book back." Singh agreed, "Yes, babaji, I'll drop off. Where do I have to go?" and Multani again stressed that the work was more than the drop-off, repeating with more clarity that Singh would "[h]ave to bring the book back and give it in Vancouver." After hearing that the contract was valued at $2000 "if it pans out," Singh confirmed his participation: "All right." This additional agreement provides critical support for the conviction because the jury could have concluded that the principals would not have brought Patel into the United States

without first securing Singh's agreement to ensure the continued operation of the human smuggling conspiracy by returning the passport to them.

**[8]** Thus, unlike the circumstances in *Lopez*, prior to the completion of the "brings to" offense, Singh arguably induced the principals to "bring" the alien "to" the United States, despite the fact that Singh did not assist in the "bringing" of the alien herself. Through his discussions with the principals, he "willingly associated," *Lopez*, 484 F.3d at 1199 (internal quotation marks omitted), himself with the smuggling enterprise, encouraged Multani to bring Patel across the border so that Singh could have work and get paid, and materially assisted the conspiracy by agreeing to bring back the passport, which was a valuable tool of the operation. Ultimately, Singh's conduct facilitated the final leg of the journey from Canada into the United States, which is the relevant part of the journey for criminal liability under Count 10. What matters as far as Singh's liability is that a rational trier of fact viewing the evidence could conclude that he induced, aided, encouraged, or counseled Multani and others in committing the "bringing to" offense with "specific intent to facilitate the commission of [the] crime." *Gaskins*, 849 F.2d at 459. Accordingly, in light of the fact that we have expressly left open the question of aiding and abetting liability for secondary state-side transporters and the fact that Singh's actions encompass much more than that, we conclude that the Singh's conviction under Count 10 does not rise to the level or plain error or manifest injustice.

## B. NO SENTENCING ERROR

Singh claims an *Apprendi* violation on the theory that the private financial gain finding for Count 10 was not found beyond a reasonable doubt by the jury. *Apprendi*, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond

a reasonable doubt." ). The *Apprendi* challenge, a question we "generally review *de novo*," *United States v. Covian-Sandoval*, 462 F.3d 1090, 1093 (9th Cir. 2006), *cert. denied*, ___ U.S. ___, 127 S. Ct. 1866 (2007), actually focuses on the sufficiency of the special verdict form regarding financial gain and the related jury instruction on burden of proof. The government argues that we should review for plain error, because Singh only raised the issue of the defective special verdict form during sentencing, not at trial. *See United States v. Delgado*, 357 F.3d 1061, 1065 (9th Cir. 2004). This debate is academic, however, because Singh cannot prevail under either standard.

**[9]** Under 8 U.S.C. § 1324 (a)(2), the baseline statutory maximum term of imprisonment for conviction of bringing an alien to the United States is "not more than one year." *Id.* at § 1324(a)(2)(A). But in the case of a first or second offense under § 1324(a)(2)(B)(ii), if the offense is committed for the purpose of commercial advantage or private financial gain, the sentence must be not less than three nor more than ten years. The financial gain factor increased Singh's sentence beyond one year. Under *Apprendi*, a sentencing factor that raises the statutory maximum, such as the financial gain purpose, must be found by the jury beyond a reasonable doubt.

The instructions included a standard "beyond a reasonable doubt" jury instruction, and each instruction setting forth the elements of an offense stated that, to prove the defendant "guilty," the government must prove the elements "beyond a reasonable doubt." The general verdict form listed each of the counts and had a column for guilty and a column for not guilty. For each count, the jury put an X in the box for guilty. The jury convicted Sigh on all five counts. In addition, a final jury instruction directed the jurors to the questions on the special verdict form, which the jurors were instructed to answer unanimously "after you have reached a unanimous agreement on a general verdict."

The special verdict form stated:

> Counts 1, 10, 11, 22 and 23 of the Fourth Superseding Indictment, charges [sic] the defendant with Conspiracy to Smuggle and Transport Illegal Aliens, Bringing an Illegal Alien to the United States, Transporting an Illegal Alien within the United States, and Harboring and Concealing an Illegal Alien. The government further alleges that each of these crimes was committed for the purpose of private financial gain.

The form then stated: "WE, THE JURY, unanimously agree as each of the following Counts that the defendant committed the crime for the purpose of private financial gain." The jury put an X in the "yes" box for every count. The jury also answered "yes" to the statement "WE, THE JURY, unanimously agree that one (1) alien was involved in Count 10."

The Government bears the burden of proving the purpose of financial gain beyond a reasonable doubt. *See United States v. Munoz*, 412 F.3d 1043, 1047 (9th Cir. 2005). The question is whether the jury did make such a finding beyond a reasonable doubt.

**[10]** This case is very similar to the one faced by the Eleventh Circuit in *United States v. O'Neal*, 362 F.3d 1310 (11th Cir. 2004), *vacated sub nom.*, *Sapp v. United States*, 543 U.S. 1107 (2005), *reinstated*, 154 Fed. Appx. 161 (11th Cir. 2005). There, the court concluded that there was no *Apprendi* violation where a special verdict regarding a sentencing factor did not mention burden of proof, but the only standard of proof in the instructions was "beyond a reasonable doubt." *O'Neal*, 362 F.3d at 1314. Similarly here, the jury instructions referenced only one burden of proof: "beyond a reasonable doubt."[6]

---

[6]During closing arguments, the attorneys never explicitly discussed the burden of proof for the special verdict. The attorneys generally spoke about reasonable doubt in the context of convicting or elements. At one

While it would have been better for the jury instructions or the special verdict form itself to have stated specifically that the financial gain question required proof beyond a reasonable doubt, in view of the overall instructions, the specificity of the special verdict form, and the single burden-of-proof instruction, there is no reasonable likelihood that the jury applied any other burden of proof that would constitute constitutional error. *Cf. Gibson v. Ortiz*, 387 F.3d 812, 821-22 (9th Cir. 2004) (opining that if the trial court had not included the preponderance of the evidence instruction, it would have assumed that the jury would have applied the only burden of proof standard it had received, which was the standard of beyond a reasonable doubt). Finally, it bears noting that there can be no serious dispute about the financial gain component. From the start, Singh was insistent that he needed and wanted to make money and he was ultimately paid for his participation. *Cf. Washington v. Recuenco*, 548 U.S. 212, 220 (2006) (holding that lack of jury finding beyond a reasonable doubt as to sentencing factor, "like failure to submit an element to the jury," can be harmless error).

**AFFIRMED.**

---

point, however, the prosecutor said "Well, ladies and gentlemen, the Defendant has admitted to you he did this activity thinking he was going to be paid, so there is *no reason to doubt* that he committed this crime for financial gain." That is not explicitly a mention of "beyond a reasonable doubt," but it is the same kind of language the prosecutor used when discussing the evidence about the elements and offenses.