**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
        *Plaintiff-Appellee,*

v.

ERNESTO FLORES-BLANCO,
        *Defendant-Appellant.*

No. 09-50040

D.C. No.
3:07-CR-03405-W-2

OPINION

Appeal from the United States District Court
for the Southern District of California
Thomas J. Whelan, District Judge, Presiding

Argued and Submitted
January 12, 2010—Pasadena, California

Filed October 4, 2010

Before: William C. Canby, Jr., Cynthia Holcomb Hall and
Diarmuid F. O'Scannlain, Circuit Judges.

Opinion by Judge Canby

16725

## COUNSEL

David D. Leshner, Assistant United States Attorney, San Diego, California, for the plaintiff-appellee.

Sylvia Baiz, San Diego, California, for the defendant-appellant.

## OPINION

CANBY, Circuit Judge:

Ernesto Flores-Blanco was arrested after border patrol agents observed him coordinating the illegal crossing of a Mexican national into the United States. Following a jury trial, Flores-Blanco was convicted of bringing an unauthorized alien to the United States for financial gain; conspiracy to bring an unauthorized alien to the United States; and inducing and encouraging an unauthorized alien to enter the United States, all in violation of various subsections of 8 U.S.C. § 1324(a). Flores-Blanco now appeals.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm. The district court did not err either in its handling of a co-defendant's invocation of the Fifth Amendment privilege against self-incrimination or in its admission of evidence of prior bad acts by Flores-Blanco. There also was sufficient evidence to uphold Flores-Blanco's conviction, as an aider and

abettor, for bringing an unauthorized alien to the United States, as well as his conviction for conspiracy.

## BACKGROUND

The underlying events took place in Calexico, California, which is located just north of the international boundary fence that separates the United States from Mexico. The city of Mexicali, Mexico, is located on the opposite side of the fence. It is possible to see through the fence.

The portion of the border fence in question is known for a high incidence of alien smuggling. According to expert testimony at Flores-Blanco's trial, guides operating on the Mexican side of the fence typically direct or lead small numbers of aliens to the fence, where a counterpart waits for the alien or aliens on the United States side. The guides on each side of the fence coordinate the crossing through the use of cell phones, hand signals, whistles, and eye contact through the fence. When an alien crosses over or through the fence, the guide in the United States is tasked with hiding the alien as quickly as possible and typically leads the alien to a predetermined location. These guides normally work for profit and usually are not paid until the alien reaches his or her final destination, which typically is beyond Calexico.

On December 9, 2007, border patrol agents Stephen Carter and Seth Sedano were conducting surveillance on the Calexico side of the fence from separate concealed locations. At approximately 8:00 p.m., the agents observed Flores-Blanco and co-defendant Mario Fernandez talking as they walked to the back yard of Flores-Blanco's residence on Second Street, located one block north of the border. For the next thirty to forty-five minutes, Flores-Blanco and Fernandez remained together in the back yard looking toward the border, which was clearly visible from their vantage point. Fernandez then left the back yard and walked to the yard of a residence on First Street located just north of the border fence, where he

attempted to conceal himself. Over the next four to five hours, Fernandez went back and forth between the First Street residence and Flores-Blanco's back yard, talking on his cell phone each time. Flores-Blanco remained in his back yard, also talking on his cell phone and looking either south toward the border or toward Fernandez.

At about 12:40 a.m., Fernandez returned to the First Street residence one final time. Agent Carter observed two males standing on the Mexican side of the fence, directly south of Fernandez's position. One of these males was talking on a cell phone and looking north toward Fernandez, who also was talking on his phone. Fernandez then motioned with his hand for the men to move east. When the men on the Mexico side moved east, Fernandez left his First Street hiding place, while continuing to talk on his cell phone. Agent Carter heard him say in Spanish, "We are ready. Now, now."

Agent Sedano then observed Flores-Blanco leave his back yard and proceed to an area known as the "White Apartments," which is located just north of the border fence and east of Fernandez's former vantage point on First Street. Agent Sedano also observed two individuals moving east on the Mexican side of the fence. Flores-Blanco crouched down outside of the White Apartments facing the fence and talked on his cell phone. Agent Sedano then saw Flores-Blanco make a waving motion with his hand and heard him inquire in Spanish, "I'm here?" Flores-Blanco then suddenly looked in Agent Sedano's direction, became startled, and walked north, away from the White Apartments and the border fence.

At about this time, Alejandro Portillo-Mendoza, a Mexican national lacking permission to enter the United States, jumped over the border fence near the White Apartments. Portillo-Mendoza had been led to the border fence by a Mexican guide who talked on his cell phone on the way to the fence. When they arrived at the fence, Portillo-Mendoza overheard the guide, who was talking on his phone, urge "[t]hat he not be

let down." The man then helped Portillo-Mendoza climb onto his shoulders, instructing him to jump over the fence when he saw a person waiting on the other side and then to run in that person's direction. When Portillo-Mendoza saw a person waiting on the other side wearing a dark-colored, hooded sweatshirt, he jumped over the fence and ran in that person's direction. But when Portillo-Mendoza arrived, the person was gone, so he tried to hide himself. Portillo-Mendoza soon was discovered in the vicinity of the White Apartments and arrested. Shortly thereafter, Flores-Blanco and Fernandez also were arrested. A video of Flores-Blanco taken after his arrest showed that he was wearing a dark-colored, hooded sweatshirt.

A federal grand jury subsequently returned an indictment against Flores-Blanco and Fernandez, charging them with: Count 1, conspiracy to bring in unauthorized aliens, 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I); Count 2, bringing in an unauthorized alien for financial gain and aiding and abetting, 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2; and Count 3, inducing and encouraging an unauthorized alien to enter the United States, 8 U.S.C. § 1324(a)(1)(A)(iv) and (v)(II). Fernandez pleaded guilty to Count 3, but Flores-Blanco proceeded to trial, where a jury convicted him on all counts.

## DISCUSSION

### I.  Co-Defendant Fernandez's Invocation of the Fifth Amendment

We first consider two challenges relating to Fernandez's refusal to testify on Flores-Blanco's behalf.

After Fernandez pleaded guilty, Flores-Blanco subpoenaed Fernandez to testify. At a hearing held outside of the presence of the jury, counsel for Flores-Blanco informed the district court that Fernandez had exculpatory evidence to offer in her client's favor. In response to the district court's request for an

offer of proof, counsel claimed that Fernandez would testify "[t]hat [it] was his job and [Flores-Blanco] had nothing to do with it." Fernandez then interjected, "[Flores-Blanco] had nothing to do with it."

Nonetheless, after conferring with counsel and being warned by the district court that he would be subject to cross-examination if he testified, Fernandez twice stated that, if called as a witness, he would assert his Fifth Amendment right against self-incrimination. Counsel for Flores-Blanco asked the government, and then the district court, to grant Fernandez use immunity, but both refused. At a later hearing convened to clarify that Fernandez's plea agreement did not prohibit him from testifying, Fernandez again stated his intention to invoke the Fifth Amendment if he were called to testify.

**[1]** Flores-Blanco first challenges the district court's refusal to compel the government to grant Fernandez use immunity. We conclude that there was no error.[1] To require the district court, as a matter of due process, to compel use immunity for Fernandez, Flores-Blanco had to make two showings. First, he had to show that Fernandez's anticipated testimony was relevant. *United States v. Straub*, 538 F.3d 1147, 1157 (9th Cir. 2008). Second, Flores-Blanco was required to show either that:

> (a) the prosecution intentionally caused [Fernandez] to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process; or (b) the prosecution granted immunity to a government witness in order to obtain that witness's testimony, but denied immunity to [Fernandez,] whose testimony would have directly

---

[1]The district court's refusal to compel use immunity to Fernandez is a mixed question of law and fact that we review de novo, although the factual findings underlying the ruling are reviewed for clear error. *United States v. Straub*, 538 F.3d 1147, 1156 (9th Cir. 2008).

> contradicted that of the government witness, with the effect of so distorting the fact-finding process that [Flores-Blanco] was denied his due process right to a fundamentally fair trial.

*Id.* at 1162. Even if we assume that Fernandez's testimony would have been relevant to Flores-Blanco's defense, Flores-Blanco has not met either of the last two requirements. Nothing in the record indicates that the government deliberately caused Fernandez to invoke his Fifth Amendment rights. Counsel's contention at oral argument that the district court intimidated Fernandez into asserting his Fifth Amendment rights also has no support in the record. Nor does anything in the record indicate that the government denied use immunity to Fernandez while granting use immunity to a government witness: there were no immunized government witnesses.

**[2]** There also was no plain error in the district court's failure to conduct additional inquiry into the propriety of Fernandez's invocation of his Fifth Amendment privilege.**²** The district court was not required to inquire into Fernandez's reasons for asserting the Fifth Amendment. Instead, "[t]o sustain the privilege, it need only [have] be[en] evident from the implications of the question, in the setting in which it [was] asked, that a responsive answer to the question or an explanation of why it cannot be answered might [have] be[en] dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486-87 (1951). Here, the district court did not plainly err by concluding that cross-examination of Fernandez on his assertion that Flores-Blanco had nothing

---

**²**Because Flores-Blanco did not object to the scope of the district court's inquiry into Fernandez's invocation of his Fifth Amendment rights, the district court's decision not to hold further hearings is reviewed for plain error. *United States v. Jaeger*, 538 F.3d 1227, 1230-31 (9th Cir. 2008). Thus, to prevail on that claim, Flores-Blanco must show error that is plain, that affects substantial rights, and that "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1231 (internal quotation marks omitted).

to do with the charged offenses would have resulted in Fernandez incriminating himself in criminal activity.

**[3]** For similar reasons, the district court did not plainly err by not inquiring into the scope of Fernandez's assertion of his Fifth Amendment privilege. Although

> a district court must ordinarily determine whether a witness will invoke his Fifth Amendment privilege "in response to specific questions," . . . [the district court] may recognize a witness's blanket privilege against self-incrimination if "the court, based on its knowledge of the case and of the testimony expected from the witness, can conclude that the witness could legitimately refuse to answer essentially all relevant questions."

*United States v. Klinger*, 128 F.3d 705, 709 (9th Cir. 1997) (quoting *United States v. Tsui*, 646 F.2d 365, 367-68 (9th Cir. 1981)). Here, the district court knew from Flores-Blanco's proffer that Fernandez's testimony inevitably would concern Fernandez's own role in the offenses. The district court also was aware that Fernandez faced un-dismissed charges, despite pleading guilty to Count 3. Accordingly, even if we assume that Fernandez's invocation of the Fifth Amendment could be construed as a "blanket refusal" to testify, the district court did not plainly err by allowing Fernandez to assert the Fifth Amendment without requiring him to be subjected to specific questions.

## II.  Admission of Rule 404(b) Evidence

Flores-Blanco also challenges the district court's admission of evidence of two of his prior acts. The jury heard testimony that, in December 2005, soon after two individuals cut through the border fence and entered the back door of a nearby residence, Flores-Blanco was seen leaving that residence through the front door, attempting to conceal the pres-

ence of an unauthorized alien who was following him. The jury also heard testimony that, in January 2006, Flores-Blanco was seen leading two unauthorized aliens, who had just jumped the border fence, in a single-file line through his yard. The district court admitted this testimony pursuant to Federal Rule of Evidence 404(b), concluding that the evidence was relevant to Flores-Blanco's intent, knowledge, and planning in the present case and that its probative value was not out-weighed by the testimony's prejudicial effect.

**[4]** Rule 404(b) prohibits the introduction of evidence of "other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith," but permits such evidence for other purposes, including "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). "So long as the evidence is offered for a proper pur-pose, . . . the district court is accorded wide discretion in deciding whether to admit the evidence, and the test for admissibility is one of relevance." *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997). Evidence of other acts may be admitted if:

> (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evi-dence is sufficient to support a finding that the defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged.

*United States v. Mayans*, 17 F.3d 1174, 1181 (9th Cir. 1994) (citations omitted). However, "even if all four conditions are met, the evidence may still be excluded if under a Federal Rule of Evidence 403 analysis its probative value is substan-tially outweighed by the danger of unfair prejudice." *United States v. Bibo-Rodriguez*, 922 F.2d 1398, 1400-01 (9th Cir. 1991) (citations omitted).

**[5]** The district court did not abuse its discretion in admitting evidence of Flores-Blanco's prior involvement in alien smuggling.[3] The evidence tended to prove the material issues of Flores-Blanco's knowledge, intent, and plan.[4] *See* Fed. R. Evid. 404(b). The prior acts, which took place approximately two years before the present offenses, were not too remote in time. *See Johnson*, 132 F.3d at 1283 (acts committed thirteen years before the offense were not too remote); *United States v. Spillone*, 879 F.2d 514, 519 (9th Cir. 1989) (conviction that was more than ten years old was not too remote in light of its similarity to the offense at issue). The testimony of the border patrol agents who apprehended Flores-Blanco on the prior occasions was sufficient to support a jury finding that Flores-Blanco committed the alleged prior acts. *See Huddleston v. United States*, 485 U.S. 681, 689 (1988); *see also United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002) (describing the third prong of the Rule 404(b) test as a "low threshold" that may be satisfied by the testimony of a single witness). Finally, the prior acts were sufficiently similar to the present offense to show Flores-Blanco's knowledge of the present smuggling scheme and his intent and plan to participate in it. The current offense and the prior apprehensions all involved the smuggling of unauthorized aliens over and through the border fence in precisely the same area of Calex-

---

[3]The district court's decision to admit Rule 404(b) evidence is reviewed for abuse of discretion, "but we consider de novo whether [that] evidence is directly relevant to the crime charged or relevant only to 'other crimes.' " *United States v. Jackson*, 84 F.3d 1154, 1158-59 (9th Cir. 1996). We also review for abuse of discretion the district court's determination that the prejudicial effect of the prior acts evidence did not substantially outweigh its probative value. *United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1062 (9th Cir. 2004).

[4]Flores-Blanco argues that knowledge was not a material issue in this case because he "never claimed that he did not know what was happening." Knowledge, however, was a material issue in this case "simply because the government had to prove [it]." *Mayans*, 17 F.3d at 1182. "[T]he fact that [Flores-Blanco's] defense was non-participation does not render the issue of knowledge irrelevant." *Id.*

ico, California, and the jury could conclude that Flores-Blanco's role in each offense was the same: to guide aliens through the neighborhood immediately after they had crossed the border.

**[6]** Nor was the probative value of the prior acts evidence substantially outweighed by any danger of unfair prejudice. The evidence was probative of Flores-Blanco's knowledge and intent and not of the type that would provoke an unfairly prejudicial emotional response. *See United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992). In addition, any prejudice was minimized by the district court's limiting instruction to the jury. *See, e.g.*, *United States v. Dhingra*, 371 F.3d 557, 567 (9th Cir. 2004).[5] The district court accordingly did not abuse its discretion in admitting the evidence of prior acts.

## III.   Sufficiency of the Evidence

Finally, Flores-Blanco argues that there was insufficient evidence to support his convictions for "bringing to" the United States an unauthorized alien for financial gain, 8 U.S.C. § 1324(a)(2)(B)(ii), and conspiracy to commit the "brings to" offense, 8 U.S.C. § 1324(a)(1)(A)(i) and (v)(I).[6]

### A.   Aiding and Abetting the "Brings To" Offense

Flores-Blanco was convicted of violating 8 U.S.C. § 1324(a)(2)(B)(ii), which punishes:

---

[5]The district court instructed the jury as follows: "You have heard evidence of other acts engaged in by the defendant. You may consider that evidence only as it bears on a defendant's intent, preparation, plan and knowledge and for no other purpose."

[6]"We review a claim of insufficient evidence *de novo* and ask whether, viewing the evidence in the light most favorable to the government, any reasonable jury could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Hernandez-Orellana*, 539 F.3d 994, 1002 (9th Cir. 2008).

Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien . . . .

It is undisputed that Flores-Blanco himself did not "bring" Portillo-Mendoza to the United States, but Flores-Blanco also was charged with aiding and abetting the "brings to" offense. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). Flores-Blanco contends that there was insufficient evidence to convict him of aiding and abetting the "brings to" offense.

**[7]** In *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc), we explained that "under certain circumstances a defendant who does not physically transport aliens across the border may be held criminally liable for aiding and abetting a 'brings to' offense." *Id.* at 1199. To convict under an aiding and abetting theory, the government must prove that the defendant "willingly associated himself with the venture and participated therein as something he wished to bring about," *id.* (internal quotation marks omitted), in that the defendant "knowingly and intentionally commanded, counseled, or encouraged the initial transporter to commit the 'brings to' offense," *id.* at 1200.

**[8]** The "brings to" offense in this case ended when the guide in Mexico assisted Portillo-Mendoza over the border fence. *See id.* at 1191 (holding that the "brings to" offense "ends when the person who transports the aliens to the country terminates his act of transportation and drops off the aliens in the United States"). The government accordingly was required to provide evidence that "sufficiently demonstrate[d] that [Flores-Blanco] was connected to conduct that occurred

*before* the entry of [Portillo-Mendoza] to the United States." *United States v. Reyes-Bosque*, 596 F.3d 1017, 1036 (9th Cir. 2010) (emphasis added).[7]

**[9]** We conclude that, when the evidence is viewed in the light most favorable to the government, a reasonable jury could have found beyond a reasonable doubt the requisite "extra-territorial connection" in Flores-Blanco's case. *Hernandez-Orellana*, 539 F.3d at 1006. Having heard evidence of Flores-Blanco's hours-long coordinated surveillance of the border with Fernandez, his repositioning himself a short distance from the border fence as Portillo-Mendoza approached, and then his waving Portillo-Mendoza across, the

---

[7]In *Lopez*, we further noted that

> [a]ny complete specification of the category of aiders and abettors would have to take into account, and attempt to avoid redundancy with, the separate offense Congress created for one who "encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law."

484 F.3d at 1199 n.16 (quoting 8 U.S.C. § 1324(a)(1)(A)(iv)). This caution is particularly relevant here because Flores-Blanco was convicted of the "encourages and induces" offense, in addition to the "brings to" offense.

The two convictions were not redundant here. In *United States v. Singh*, 532 F.3d 1053 (9th Cir. 2008), we explained that "[t]he 'encourages or induces' offense criminalizes the act of encouraging *the alien herself* to illegally enter or reside in the United States, whereas aiding and abetting the principal in a 'bringing to' offense criminalizes the act of aiding, counseling, inducing or encouraging *not the alien but the principal*." *Id.* at 1059 (internal citations omitted). We are satisfied that the evidence of Flores-Blanco's encouragement of Portillo-Mendoza (waiting for him on the United States side and waving him across) is sufficiently distinguishable from the evidence of Flores-Blanco's encouragement of the smuggler on the Mexico side (circumstantially indicating that Flores-Blanco agreed to transport Portillo-Mendoza to a safe hiding place upon the alien's crossing). Flores-Blanco has not challenged the evidence supporting his "encourages and induces" conviction.

jury could infer that Flores-Blanco "willingly associated him-self with the [smuggling] venture and participated therein as something he wished to bring about." *Lopez*, 484 F.3d at 1199 (quoting *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir. 1980)).[8] The jury also heard evidence that, typically, the guide on the United States side is assigned the task of hiding the alien as quickly as possible and that none of the smugglers get paid until the alien reaches his final destination. Here, not long before the crossing, the smuggler on the Mexico side, speaking into his phone, urged "[t]hat he not be let down," and soon thereafter he instructed Portillo-Mendoza to jump over the fence and run toward the person waiting on the other side. A reasonable jury could conclude from this evidence that Flores-Blanco actively encouraged the guide to send Portillo-Mendoza over the fence and that the Mexican smuggler would not have done so without first securing Flores-Blanco's agreement to guide Portillo-Mendoza into hiding. *See United States v. Corona-Verbera*, 509 F.3d 1105, 1119 (9th Cir. 2007) ("Circumstantial evidence may support a conviction as an aider and abetter.").

Flores-Blanco's case is easily distinguished from *Lopez* and *Hernandez-Orellana*, where the evidence of pre-offense conduct by the defendants was insufficient to support a "brings to" conviction under an aiding and abetting theory. In *Lopez*, the defendant "was contacted on the day she transported [several unauthorized aliens] only after the aliens were already in the country and the plan for the first person to pick them up had been frustrated by his arrest when he appeared at the designated location." 484 F.3d at 1200. We found irrelevant the fact that, *after* picking up the aliens, the defendant twice spoke to the person who might have been the initial trans-porter, and we rejected as speculative the government's other attempts to link the defendant's pre-offense conduct to the

---

[8]Flores-Blanco's use of a cell phone and hand signals also was consis-tent with the expert testimony on the *modus operandi* of alien smugglers in the relevant border fence area.

smuggling venture. *Id.* at 1200-01. Similarly, in *Hernandez-Orellana*, we reversed the "brings to" convictions of two defendants because, although the evidence showed that the defendants were involved in alien smuggling "as a general matter," there was no specific evidence indicating that the defendants had encouraged and induced the smuggling of the two illegal aliens named in the indictment. 539 F.3d at 1006.

**[10]** Here, in contrast, all of the relevant conduct by Flores-Blanco took place *before* the offense was completed, and, as described above, there was sufficient evidence for the jury to conclude that this conduct induced the smuggler in Mexico to deliver Portillo-Mendoza across the fence. Flores-Blanco's case is comparable to *United States v. Singh*, 532 F.3d 1053 (9th Cir. 2008), where, on plain error review, we upheld a "brings to" conviction because, prior to the start of the offense, the defendant agreed not only to transport a smuggled alien within the United States, but also to "bring[ ] the [alien's] passport back to the principals in Canada," thereby "ensur[ing] the continued operation of the human smuggling conspiracy." *Id.* at 1061; *see also Reyes-Bosque*, 596 F.3d at 1036 (finding sufficient evidence of pre-offense conduct where a group of aliens had been brought to the house where the defendant operated an alien smuggling scheme and a ledger of smuggling-related activities seized from that house listed the name of one of the illegal aliens in that group). We accordingly reject Flores-Blanco's challenge to the sufficiency of the evidence for his "brings to" conviction.

## B.   Conspiracy to Commit the "Brings To" Offense

**[11]** Flores-Blanco also argues that the evidence was insufficient to support his conviction for conspiring to commit the "brings to" offense. He relies primarily on *Lopez*, but, as we explained in *Hernandez-Orellana*, "nothing in *Lopez* can be read as transforming the traditional elements of a criminal conspiracy." *Hernandez-Orellana*, 539 F.3d at 1006. The evi-

dence was sufficient to prove those "traditional elements" in Flores-Blanco's case. A reasonable jury could infer an agreement to engage in criminal activity between Flores-Blanco, Fernandez, and the smuggler in Mexico from their considerable coordination in positions and timing using cell phones and hand signals. *See United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997) ("Coordination between conspirators is strong circumstantial proof of agreement; as the degree of coordination rises, the likelihood that their actions were driven by an agreement increases."). The Mexican smuggler's assistance to Portillo-Mendoza in crossing the fence was an overt act in furtherance of the conspiracy. *See Hernandez-Orellana*, 539 F.3d at 1010; *see also id.* at 1007 ("[I]t matters only that a co-conspirator commit the overt act, not necessarily that the accused herself does so."). There also was sufficient evidence that Flores-Blanco had the "requisite intent to commit the substantive crime," *id.* at 1107 (internal quotation marks omitted), specifically, that he knew that Portillo-Mendoza was an alien and acted with the intent to violate United States immigration laws, *see United States v. Gonzalez-Flores*, 418 F.3d 1093, 1098 (9th Cir. 2005). The prior acts evidence was probative of Flores-Blanco's knowledge and intent in the present case, as was Flores-Blanco's abrupt departure from the White Apartments when he saw Agent Sedano. *See, e.g.*, *United States v. Baker*, 256 F.3d 855, 863 (9th Cir. 2001) (inferring knowledge of a package's illicit contents in part from the defendant's nervous behavior and "flight when confronted by the detectives"). We therefore reject Flores-Blanco's challenge to the sufficiency of the evidence for his conspiracy conviction.

## CONCLUSION

For the foregoing reasons, Flores-Blanco's convictions are

**AFFIRMED.**