**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

NORMA HERNANDEZ-ORELLANA,
*Defendant-Appellant.*

No. 06-50584

D.C. No.
CR-05-01282-NAJ

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

MARITZA OLMEDA DREWRY,
*Defendant-Appellant.*

No. 06-50620

D.C. No.
CR-05-01282-2-NAJ

OPINION

Appeal from the United States District Court
for the Southern District of California
Napoleon A. Jones, District Judge, Presiding

Argued and Submitted
June 3, 2008—Pasadena, California

Filed August 20, 2008

Before: Diarmuid F. O'Scannlain and Richard C. Tallman,
Circuit Judges, and James K. Singleton,*
Senior District Judge.

Opinion by Judge Tallman

*The Honorable James K. Singleton, Senior United States District
Judge for the District of Alaska, sitting by designation.

11143

**COUNSEL**

Steven S. Lubliner, Esquire, Criminal Justice Act Attorney, Petaluma, California, for defendant-appellant Norma Hernandez-Orellana.

David J. Zugman, Esquire, Criminal Justice Act Attorney, San Diego, California, for defendant-appellant Maritza Olmeda Drewry.

William M. Narus, Esquire, Assistant United States Attorney, San Diego, California, for plaintiff-appellee United States of America.

## OPINION

TALLMAN, Circuit Judge:

Today, we address the question left open in *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc), to explain what actions render a co-conspirator criminally liable for an alien smuggling conspiracy for profit even though there is no evidence that the conspirator herself committed an actual overt act of smuggling aliens across the border but other co-conspirators did. We hold that a reasonable jury could have determined that Maritza Olmeda Drewry (Drewry)[1] and Norma Hernandez-Orellana (Hernandez) participated in a conspiracy to bring aliens from Mexico to the United States for financial gain in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324. We conclude that our en banc decision in *Lopez* decided during the pendency of this case compels the reversal of Drewry's and Hernandez's convictions on the substantive "bringing to" counts, 8 U.S.C. § 1324(a)(2)(B)(ii). We therefore affirm in part and reverse in part the judgment of the district court. Because it is unclear whether the district court would have imposed the same sentence in light of our decision to reverse the substantive bringing to counts, we also remand for resentencing.

---

[1]In the Presentence Report and Judgment, Drewry's name is spelled Drewry. In the Superceding Indictment and Reporter's Transcripts, it is spelled Drewery. We use the former spelling throughout this opinion.

# I

The material facts of this case are not seriously in dispute. On June 19, 2005, Hernandez was caught driving an SUV with ten undocumented aliens through the Interstate 15 Temecula Border Patrol checkpoint located between San Diego and Los Angeles, California. Agent Ryan Myers was on duty as the primary immigration inspector. From his vantage point Myers was only able to view Hernandez and four of the aliens inside the vehicle. Myers questioned Hernandez about the immigration status of the aliens and learned they had no documents. As a result, he directed Hernandez to secondary screening. At secondary, agent Erik Cansino discovered another six aliens hiding in the SUV. Ultimately, the aliens were permitted to voluntarily return to Mexico, and Hernandez was identified, questioned, and released.

Approximately one month thereafter, authorities received a tip concerning alien smuggling at a San Diego "load house" just north of the United States-Mexico border. Border Patrol agents Brian Desrosiers and Damian Caraway responded. Once at the residence, Desrosiers observed Drewry heading toward a white Toyota Tundra SUV, which she subsequently entered. He also saw Hernandez accompanying two individuals to the vehicle who, as subsequent investigation confirmed, turned out to be undocumented aliens. The aliens climbed in the back of the Tundra, and Hernandez entered the front passenger door.

The agents immediately stopped Drewry as she began to drive everyone away from the house. Desrosiers confirmed the identity of the driver as Drewry and that the aliens lacked immigration documentation. He and Caraway then arrested Drewry and Hernandez; and they called for more Border Patrol officers.

When back up arrived at the scene, agents searched the residence from which the aliens had emerged and nearby vehi-

cles. In a maroon Toyota Tundra, which agents later determined was registered to Hernandez, Border Patrol agents recovered an incriminating ledger. The ledger documented smuggling activities from Mexico to California from approximately June 30, 2005, until July 15, 2005. The ledger contained the names of various drivers, guides, and the going rates for cross-border smuggling. In addition, the name "Diana" (an alias Drewry used) appeared in the ledger along with "x 10" and the date "07-7-2005," which the jury could find suggested that Drewry was responsible for transporting or arranging transportation for ten undocumented aliens into the United States on July 7, 2005. The names of the guides and the smuggling price for each alien were all listed.

The ledger identified additional aliens for whom Drewry had responsibility to transport or to make transportation arrangements. Listed was one alien smuggled on June 30, 2005, twelve aliens on July 1, 2005, two aliens on July 4, 2005, and three aliens on July 11, 2005. Finally, the ledger indicated that Drewry owed Hernandez $9,000 for driving aliens.

Border Patrol agents also discovered a journal in the garage of the residence. The journal, like the ledger, identified other aliens apparently transported across the border, names of foot guides, smugglers, and drivers. Agents also searched Drewry's purse in which they found an envelope with $1,600 in cash — the market rate for smuggling an alien from Mexico to the United States.

At trial, Hector Contreras-Garcia, one of the two aliens found with Drewry, explained that he paid $3,300 to be smuggled across the border. He and his wife along with two others made the crossing in the trunk of a car. Once across the border, Garcia and his wife were taken by another driver in Hernandez's maroon SUV to the load house, where Hernandez greeted them. The aliens stayed there for an unspecified period of time. At some point, though, not more than a few

days after their arrival, Drewry appeared at the house to escort them to the white Tundra. Garcia testified that prior to trial, and as further evidence of her guilt, Drewry threatened him not to testify.

Teresa Camarena-Reyes, Garcia's wife, testified to similar witness intimidation. She stated that she too had been threatened not to reveal anything by Hernandez — while Drewry was present — shortly before a court hearing.

Erica Osuna-Millan, an alien living at the load house, explained at trial that she had witnessed Drewry instructing Hernandez to bring aliens to certain locations and that she saw Drewry pay Hernandez for Hernandez's efforts. Millan also watched as new aliens arrived and stayed at the residence. The arrival of the new aliens, Millan testified, seemed to coincide with the comings and goings of Drewry to and from the home. Millan echoed Reyes's and Garcia's statements that she had been warned by Drewry as well not to say anything during court proceedings that might be adverse to Drewry or Hernandez. This warning occurred after a motions hearing and was in violation of the district court's order that Drewry not have contact with witnesses.

Following her arrest, Hernandez gave a statement to agents. Agents properly advised Hernandez of her *Miranda* rights, and she agreed that her statement could be videotaped. Of particular relevance was the following exchange, presented to the jury in transcript form, in which Hernandez admitted she previously had been arrested at the Temecula checkpoint on June 19, 2005:

M1 [Interrogator]:   You have been arrested before, right?

F1 [Hernandez]:   Yes. And I did . . .

M1:   For crossing people?

F1:    I . . . Yes, exactly. For the person I was telling you about . . . .

M1:    Who was that person?

F1:    She . . . They caller her . . . "Letty." Only by "Letty." But, uh, her name on the, on the cellular says, "Angelica."

M1:    Angelica what?

F1:    I don't know . . . .

M1:    Letty . . . ? You don't know Letty?

F1:    No.

M1:    Where does . . . Letty live?

F1:    She lives at 1433 "Sakterback . . . , bait . . ."

M1:    "Cedar Butte."

F1:    Yes. In, in "Isleik."

M1:    In Eastlake.

F1:    All I know is that it's on Palomar and . . . Because I went to do the pick-up for that job that day. I didn't want . . .

M1:    What day was that?

F1:    The 19th of June.

M1:    Of June?

F1:    Uh-huh.

M1:   And what did you do on that day?

F1:   "I . . . She told me she was going to give me 50 per person, and I was going to . . . I was taking 10. She was going to give me 500 dollars[.]

M1:   Five hundred dollars to take people from . . .

. . .

F1:   . . . from San Diego all the way to there.

M1:   To where?

F1:   . . . All the way to Los Angeles.

. . .

M1:   . . . [W]here were you going to arrive at? Around where was your final destination?

F1:   Well . . . she told me, "You call once you have crossed."

M1:   "Crossed." That she meant to say that . . .

F1:   Cross. That I have already cross the . . .

. . .

M1:   In Temecula? Or, where?

F1:   Uh-huh, yes, in Temecula. I was going to call her and I didn't, I didn't call her. I called her once I was arrested and I came out of there. I told her that, that how it was that, that, that the people had been taken from me. She, she

learned it from the beginning because she sup-
posedly was going to be checking. Yes? You
understan[d]? She told me, "Oh, I'm going to
. . . I'm going to . . . I'll be checking you. And
you, once . . ." And she said to me, "You can
cross." At the moment when I'm crossing the
patrol cars stopped and I ended up as the fourth
car. I ended up on the, on the line . . .

M1:   Okay.

F1:   . . . that's when we were arrested.

M1:   And, and as to the other vehicles that are
      under your name . . .

F1:   Okay. That one, those cars, she has used my
      name.

M1:   Who? Who is she?

F1:   Letty. Well, she, look, I'll tell you how they
      operate. They take your name, "Oh lend it to
      me and I'll take it out of your name." I didn't
      even know that car was under my name. That
      is all . . .

M1:   There are several cars under your name.

F1:   Yes, yes.

M1:   That have [ ] been used in people smuggling.

F1:   Exactly. Exactly. Exactly. But I didn't know.

During the course of the interview, Hernandez also
explained her motivation for transporting aliens. Although she
made a living cleaning houses, she "suddenly" was overcome

with "greed" and "[a]mbition." Hernandez also believed her participation came about because "[t]hey brainwash you and then you do it."

Hernandez further told authorities that she derived additional income from allowing the smugglers to register load vehicles in her name. She would receive $150 per car, and admitted that smugglers would take the cars registered under her name "and use them how they wanted[.]" Hernandez claimed that she was duped into thinking that the smugglers would soon change the registration of the vehicle to a different name and was unaware of exactly how many vehicles remained in her name.

Hernandez recalled that Letty's alien smuggling operation largely consisted of family members. Although Hernandez could recall only one of the children's names, Junior, Letty's husband was "the one that checks the jobs."

On May 31, 2005, a federal grand jury returned an eleven-count superseding indictment charging Hernandez, Drewry, and co-defendant Cesar Ramos-Vasquez with conspiracy to bring illegal aliens into the United States for the purpose of financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 371 (count one); bringing Teresa Camarena-Reyes, an illegal alien, into the United States on July 14, 2005, for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2 (count two); bringing Hector Contreras-Garcia, an illegal alien, into the United States on July 14, 2005, for financial gain in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and 18 U.S.C. § 2 (count three); unlawfully harboring Reyes in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) & (v)(II) (count four); unlawfully harboring Garcia in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) & (v)(II) (count five); unlawfully transporting Reyes within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) & (v)(II) (count six); unlawfully transporting Garcia within the United States in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) & (v)(II) (count

seven); Vasquez with using a falsely made border crossing card bearing the name Manuel Odin Lopez Torres in violation of 18 U.S.C. § 1546(a) (count eight); Hernandez with unlawfully transporting Estanislao Cortez-Cruz, an illegal alien, within the United States on June 19, 2005, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (count nine); Hernandez with unlawfully transporting Isaias Tomas Mendez-Vasquez, an illegal alien, within the United States on June 19, 2005, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (count ten); and Hernandez with unlawfully transporting Eugenio Hernandez-Rojas, an illegal alien, within the United States on June 19, 2005, in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (count eleven).

On June 9, 2006, after a two-day trial, the jury returned guilty verdicts on all counts naming Drewry and Hernandez. The district court subsequently sentenced Drewry to sixty months incarceration along with three years of supervised release. Hernandez received a prison term of thirty-six months along with three years of supervised release. This timely appeal followed.

## II

Drewry initially complains that the district court should have severed her trial from Hernandez's. She makes two related arguments that she believes warrant reversal of her convictions. First, Drewry asserts that the district court's admission at trial of a transcript of Hernandez's videotaped interview with law enforcement officers deprived Drewry of her Sixth Amendment right to confrontation. She also insists that introduction of the transcript exacerbated the two defendants' mutually antagonistic defenses. We review constitutional questions *de novo* and the district court's determination that severance was unnecessary for abuse of discretion. *United States v. Sullivan*, 522 F.3d 967, 981 (9th Cir. 2008). We conclude that Drewrey's arguments lack merit.

## A

**[1]** The question of Hernandez's post-arrest statements initially was addressed at a May 25, 2006, hearing on motions *in limine*. The district court agreed that to avoid problems under *Bruton v. United States*, 391 U.S. 123 (1968), and *Crawford v. Washington*, 541 U.S. 36 (2004), "[p]rudence dictate[d]" that Hernandez's statements be edited such that Drewry was not named or implicated. Ultimately, the parties agreed to the government's proposal that it:

> prepare a transcript and redact any reference to the other defendant. When Ms. Hernandez makes statements, any statements referring to the ones[,] in compliance with *Bruton*, we would redact. We would submit these to defense counsel, give them an opportunity to look at it and see if the parties can come to a stipulated transcript as to the two statements by Ms. Hernandez.

The district court admonished the defense attorneys to "[l]ook at the transcripts, counsel. If there are problems, bring them to the court's attention." No objections were lodged to the transcript submitted to the jury.

**[2]** Drewry's severance argument, in the first instance, has been waived. As a general rule, a party must renew her pretrial severance motion at the conclusion of the presentation of evidence. *See Sullivan*, 522 F.3d at 981. The record does not reflect that Drewry renewed her motion. Even on plain error review, *see United States v. Cope*, 527 F.3d 944, 957 (9th Cir. 2008), the district court did not err in failing to sever the trial.

**[3]** It is well-established that in the federal system there is a preference for joint trials where defendants have been jointly indicted. *Zafiro v. United States*, 506 U.S. 534, 537 (1993). Under certain circumstances, none of which are present here, Federal Rule of Criminal Procedure 14 provides

relief from prejudicial joinder. Fed. R. Cr. P. 14(a) (stating "[i]f the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant . . . the court may . . . sever the defendants' trials"). We have developed a four-part test to aid the district court's determination, including: "(1) whether the jury may reasonably be expected to collate and appraise the individual evidence against each defendant; (2) the judge's diligence in instructing the jury on the limited purposes for which certain evidence may be used; (3) whether the nature of the evidence and the legal concepts involved are within the competence of the ordinary juror; and (4) whether Appellants could show, with some particularity, a risk that the joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Sullivan*, 522 F.3d at 982 n.9 (internal quotation marks and citation omitted).

Drewry's argument focuses on the fourth prong, compromise of her specific trial rights. She contends that *Crawford* prevents Hernandez's statements from being admitted against her because Hernandez cannot be compelled to testify in Hernandez's own trial and thus Drewry could not confront Hernandez on cross-examination.

**[4]** Drewry, however, ignores the very careful manner in which the district court proceeded. Significantly, the government was required to redact any damaging statements in the transcripts with respect to her. And a review of the record confirms that no statement introduced even mentioned Drewry. As the government points out, under *Bruton* and its progeny "the admission of a statement made by a non-testifying codefendant violates the Confrontation Clause when that statement facially, expressly, or powerfully implicates the defendant." *United States v. Mitchell*, 502 F.3d 931, 965 (9th Cir. 2007) (internal quotation marks and citation omitted). Nothing in the record can be read as implicating Drewry, let alone in the manner of a *Bruton* violation. Thus, Drewry's contention that her specific right to confront the witnesses

against her was abridged is unavailing. *See United States v. Hernandez*, 608 F.2d 741, 749 (9th Cir. 1979) (explaining that "[w]here a statement does not allude to the defendant, or where all references have been deleted, his right of confrontation is not abridged") (internal quotation marks and citations omitted).

### B

Drewry maintains that combined with Hernandez's statements, Hernandez's defense amounted to a blame game: Hernandez could point the finger at Drewry without any remedy available to Drewry. Their defenses, Drewry concludes, were mutually antagonistic.

**[5]** Drewry's claim, in essence, amounts to a sort of catch-all guilt-by-association argument. However, we have described Drewry's burden as a heavy one, and the district court's decision not to sever trials seldom will be disturbed. *See United States v. Ponce*, 51 F.3d 820, 831 (9th Cir. 1995). Indeed, in order to prevail on an antagonistic defense theory, Drewry must demonstrate that "acquittal of [Hernandez] would necessarily call for [her own] conviction." *See United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991); *see also United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996) (reasoning that the "defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant").

**[6]** Drewry cannot meet that heavy burden here. Importantly, her argument is belied by the fact that the jury convicted her and Hernandez of all counts with which they were charged. In the end, the record does not compel the result that, because Drewry and Hernandez had different interests in the trial, severance was necessary.

### III

Hernandez urges us to reverse her conviction as to count nine of the superseding indictment because, she alleges, the government failed to prove the alienage of the individuals in her vehicle. We disagree.

Title 8, section 1324(a) of the United States Code provides criminal sanctions for:

(1)(A)   Any person who—

. . .

> (ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law.

Hernandez claims that the government was unable to show that she knew of, or acted in reckless disregard as to the illegal status of Estanislao Cortez-Cruz. We review a claim of insufficient evidence *de novo* and ask whether, viewing the evidence in the light most favorable to the government, any reasonable jury could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004)

Cruz was one of the aliens found inside Hernandez's vehicle when it was stopped at the Interstate 15 Temecula checkpoint on June 19, 2005. Agent Myers specifically asked Hernandez whether the aliens had immigration documents. Hernandez admitted that "no, nobody does." At that point, the

vehicle was sent to secondary inspection where the additional aliens were discovered packed in the SUV.

[7] Hernandez made other damaging statements during her taped interview about the events that took place on June 19, 2005. Hernandez explained that a woman named "Letty" had paid her $500 to drive the aliens through the Temecula checkpoint. This statement lends a reasonable inference that those present in the vehicle were inside the United States unlawfully: there would be no need to pay Hernandez fifty dollars per alien to drive them through a border checkpoint if they were legally in the United States. At a minimum, Hernandez was in reckless disregard of the reason why she was being paid to transport these individuals if they were not, as she claims, illegal aliens.

[8] The conditions in which the aliens were found further supports this conclusion. First, only four individuals were visible from outside the vehicle to Border Patrol agents. The other six were found hidden inside upon closer inspection. Second, the individuals were not wearing seatbelts suggesting that there was not enough room to safely transport the aliens, the aliens were attempting to pass unnoticed, and Hernandez was attempting to maximize the space in her vehicle in order to maximize what she was to be paid. Finally, after the June 19, 2005, incident, the individuals inside her SUV were permitted to voluntarily return to Mexico.

[9] Taken together, a reasonable jury could have concluded beyond a reasonable doubt that the aliens were unlawfully in the United States and Hernandez either knew that fact or turned a blind eye toward it. Sufficient evidence, therefore, supports Hernandez's conviction on count nine.

## IV

[10] Whether sufficient evidence supports Drewry's and Hernandez's convictions on count one, conspiracy to bring

illegal aliens into the United States, and counts two and three, bringing illegal aliens into the United States for financial gain presents, in our view, the closer question. We conclude that *Lopez* compels us to reverse the substantive "bringing to" convictions on counts two and three. However, the totality of the evidence plainly is sufficient for a reasonable jury to determine beyond a reasonable doubt that Drewry and Hernandez were active and knowing participants in the international smuggling conspiracy.

The so-called "bringing to" offense imposes criminal penalties on individuals who:

> knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—
>
> . . .
>
> (B)   in the case of—
>
> . . .
>
> (ii)   an offense done for the purpose of commercial advantage or private financial gain, or
>
> . . .
>
> be fined under Title 18 and shall be imprisoned, . . . in the case of a first or second violation of subparagraph . . . (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

8 U.S.C. § 1324(a)(2).

**[11]** In *Lopez*, we concluded that a bringing to offense terminated at the time aliens were transported across the border and "drop[ped] off" in the United States. 484 F.3d at 1191. As a result, we "overrule[d] any of our prior decisions that adopt or suggest a different rule." *Id.* Specifically, we rejected "the 'immediate destination' (or ultimate destination) test set forth in *United States v. Ramirez-Martinez.*" *Id.* (citing *United States v. Ramirez-Martinez*, 273 F.3d 903 (9th Cir. 2001)). *Ramirez*'s immediate destination theory, we explained, stands for the proposition that "a 'brings to' offense does not terminate until the aliens reach their 'immediate destination' within the United States, and that anyone who transports the aliens within the United States before that point has, based on that conduct alone, aided and abetted the 'brings to' crime." *Id.* at n.7 (citation omitted).

**[12]** We reasoned that our reading of the statute "best harmonizes the various separate, but often interrelated parts of the statute." *Id.* at 1195. We observed:

> [T]he "brings to" language of § 1324(a)(2) clearly connotes the act of bringing the alien "from outside" the country. The "transports within" offense of § 1324(a)(1)(A)(ii), by contrast, does not by its text implicate extraterritorial behavior. Indeed, the language of the latter provision limits the offense to acts "within the United States." On a plain reading of the statutory language, then, a person who moves aliens from one location in the United States to another has not brought those aliens "to" the United States, has not acted extraterritorially, and has not committed a "brings to" offense. He has acted entirely on domestic soil and has committed only a "transports within" offense. An interpretation of § 1324(a)(2) as persisting beyond the point at which the extraterritorial transporter terminates his conduct and drops the

> aliens off at some location in the United States would thus undermine the extraterritorial foundation of the crime as well as the distinction Congress established between bringing an alien "to" the United States and transporting one already inside the country.

*Id.* at 1198 (internal citations omitted).

**[13]** Under the facts of *Lopez*, because it was undisputed that the defendant "encountered the aliens and provided them with transportation only after they had been dropped off in the United States," the defendant's conduct "occurred only after the 'brings to' offense had terminated." *Id.* Consequently, these actions, "standing alone, [could not] serve as a basis for sustaining her conviction."

**[14]** We made clear, however, that there were certain instances in which a defendant could aid and abet a brings to offense from within the United States alone.

> It is clear that under certain circumstances a defendant who does not physically transport aliens across the border may be held criminally liable for aiding and abetting a "brings to" offense. A financier who organizes and funds a smuggling operation, for example, whether located in or outside of the United States, may be said to have "associate[d] himself with the venture, . . . participate[d] in it as in something he wishe[d] to bring about, [and sought] by his action to make it succeed."

*Id.* at 1199.

**[15]** The defendant in *Lopez*, however, could not be held criminally liable on such a theory because "[t]he mere act of picking up aliens at a location near the border and transporting them within the United States is not sufficient to support

a conviction for aiding and abetting a 'brings to' offense." *Id.* at 1199-1200. Similarly, we were unpersuaded by the fact that the defendant had twice spoken to a person who might have been the initial transporter after the aliens were dropped off, the defendant put the vehicle in her name and traveled near the border to pick the car up, and that the defendant could provide agents with a description of the initial transporter — presumably suggesting that the defendant had prior contact with the transporter. This evidence, we concluded, amounted to "mere suspicion or speculation [that] does not rise to the level of sufficient evidence." *Id.* at 1200.

In sum, "any rational juror would have had at the least a reasonable doubt as to whether Lopez 'knowingly and intentionally aided, counseled, commanded, induced or procured [the principal] to commit each element' of the 'brings to' offense." *Id.*

**A**

The substantive counts here, numbered two and three, read as follows:

*Count 2*

On or about July 14, 2005 . . . defendants NORMA HERNANDEZ-ORELLANA, MARITZA OLMEDA DREWRY, and CESAR RAMOS-VASQUEZ, with the intent to violate the immigration laws of the United States, knowing and in reckless disregard of the fact that an alien, namely, Teresa Camarena-Reyes, had not received prior official authorization to come to, enter and reside in the United States, did bring to the United States said alien for the purpose of commercial advantage and private financial gain.

*Count 3*

> On or about July 14, 2005 . . . defendants
> NORMA HERNANDEZ-ORELLANA, MARITZA
> OLMEDA DREWRY, and CESAR RAMOS-
> VASQUEZ, with the intent to violate the immigra-
> tion laws of the United States, knowing and in reck-
> less disregard of the fact that an alien, namely,
> Hector Contreras-Garcia, had not received prior offi-
> cial authorization to come to, enter and reside in the
> United States, did bring to the United States said
> alien for the purpose of commercial advantage and
> private financial gain.

We think it arguable that the government's proofs at trial
linked Drewry and Hernandez only to post-termination con-
duct for purposes of these substantive "brings to" offenses
under the rationale of *Lopez*. But even *Lopez* left open the
door to liability for other criminal conduct, including potential
aider and abettor liability. It is not a long reach to impose con-
spiracy liability as charged on this record. The government
cites to evidence that clearly show that Drewry was involved
in *some* illegal activity. It first argues that the ledger and jour-
nal recovered during the search of the residence and vehicles
"prove that, as part of the alien smuggling conspiracy, Drewry
was responsible for numerous aliens being brought to the
United State *before* the aliens in Counts 2 and 3 crossed the
border." Second, the government maintains that "Drewry kept
track of which guides led which aliens across the border, and
kept track of who was owed what, again *before* the aliens in
Counts 2 and 3 crossed the border." Third, the government
contends that "Drewry instructed Hernandez where to drive
aliens, and paid Hernandez for her smuggling, also *before* the
aliens in Counts 2 and 3 crossed the border."

[16] Problematically for the government here, however,
counts two and three specifically identify the aliens who were
allegedly "brought to" the United States. The evidence pres-
ented to the jury stops short of linking those aliens to Drewry
and Hernandez that would support their liability for conduct

that occurred *before* the bringing to offense terminated. Significantly, the ledger and the journal make no reference to aliens Garcia or Reyes at all.

**[17]** Similarly, Drewry's instructions to Hernandez as to where to drive the aliens had nothing to do with Garcia and Reyes, and importantly, only included directives to take unnamed aliens to locations *after* they had been dropped off in the United States. Millan, the alien living at the load house — and upon whose testimony the government relies — confirms only that (1) Millan overheard "Diana [ ] talking to Norma how she was going to take some people"; (2) Hernandez and Drewry did not discuss exact addresses; only that the transportation would occur "well, only here in the United States"; and (3) that money changed hands between Drewry and Hernandez at the residence. Ultimately, Millan testified that "Diana . . . she used to bring people, and she would take people, and she used to pay the people that helped her[.]" Indeed, Millan characterized Drewry as "the one who delivered the people to their families[.]"

**[18]** The evidence, therefore, establishes no explicit extraterritorial connection as *Lopez* requires. The undisputed facts reveal that Hernandez allowed an individual to use a vehicle registered in her name to pick up Reyes and Garcia after they had crossed the border and had been dropped off in the United States. Hernandez only met Reyes and Garcia once they arrived at the load house. At best, then, Hernandez can only be linked to the vehicle that transported Garcia and Reyes within the United States. Drewry, for her part, is even farther removed. After the aliens arrived at the residence and stayed for a short while, Drewry attempted to drive them to an unknown location. At that point, she was stopped by Border Patrol agents.

**[19]** In the end, although money exchanged hands for some unknown activities prior to Garcia's and Reyes's crossing, the ledger and journal revealed that Drewry had some connection

to transporting aliens as a general matter, testimony revealed that Drewry had discussed where to bring aliens within the United States in general terms, Drewry would take and bring aliens to different locations as a general proposition, and Hernandez's vehicle was used to take Garcia and Reyes from some point in the United States to the residence, there is no specific evidence linking Drewry and Hernandez to "intentionally aid[ing], counsel[ing], command[ing], induc[ing] or procur[ing]" the cross-border transportation of Reyes and Garcia, prior to when these aliens were dropped off in the United States. *See id.*

**[20]** Because Drewry and Hernandez engaged in "the mere act of picking up aliens at a location near the border and transporting them within the United States," we are compelled by *Lopez* to find that they are not criminally liable under the theories alleged in the substantive "bringing to" counts. *Id.* at 1999-1200. Therefore, we reverse Drewry's and Hernandez's sentences and convictions on those two substantive counts.

**B**

**[21]** We cannot agree that *Lopez* mandates the same result for their conviction for participating in the alien smuggling conspiracy. Three considerations inform our conclusion.

1

**[22]** First, nothing in *Lopez* can be read as transforming the traditional elements of a criminal conspiracy, which would not under the circumstances presented here require either Drewry or Hernandez to have physically smuggled the illegal aliens across the border or to have specifically taken a substantial step to achieve that end. In other words, *Lopez* addressed only the evidentiary requirements sufficient for a conviction of a *substantive* "bringing to" crime and *aiding and abetting* that offense for which there was marginal evidence.

The difference between the classic common law elements of aiding and abetting and a criminal conspiracy underscores this material distinction, although at first blush the two appear similar. Aiding and abetting the commission of a specific crime, we have held, includes four elements: (1) that the accused had the specific intent to facilitate the commission of a crime by another, (2) that the accused had the requisite intent to commit the underlying substantive offense, (3) that the accused assisted or participated in the commission of the underlying substantive offense, and (4) that the principal committed the underlying offense. *United States v. Gaskins*, 849 F.2d 454, 459 (9th Cir. 1988). As *Lopez* emphasized, the accused generally must "associate[ ] himself with the venture . . . participate[ ] in it as something he wish[es] to bring about, and [sought by] his action to make it succeed." 484 F.3d at 1199 (internal quotation marks omitted).

By contrast, a classic criminal conspiracy as charged in 18 U.S.C. § 371 is broader. The government need only prove "(1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *Sullivan,* 522 F.3d at 976 (internal quotation marks omitted). Indeed, a drug conspiracy does not even require commission of an overt act in furtherance of the conspiracy. 21 U.S.C. § 846; *United States v. Jackson*, 167 F.3d 1280, 1285 (9th Cir. 1999).

Two distinctions become readily apparent after a more careful comparison. First, the substantive offense which may be the object in a § 371 conspiracy need not be completed. Second, the emphasis in a § 371 conspiracy is on whether one or more overt acts was undertaken. This language necessarily is couched in passive voice for it matters only that a co-conspirator commit the overt act, not necessarily that the accused herself does so. In an aiding and abetting case, not only must the underlying *substantive offense* actually be completed by someone, but the accused must take some action, a *substantial step*, toward associating herself with the criminal

venture. *See Lopez*, 484 F.3d at 1199. These differences are critical to the disposition of this case because neither Drewry nor Hernandez undertook the critical *pre-border crossing* step. They clearly committed overt acts domestically in furtherance of the alien smuggling enterprise; but they need not have done so internationally to violate the general conspiracy statute. *See* 18 U.S.C. § 371.

**[23]** The case law further distinguishes a § 371 conspiracy. Significantly, we have held that "[t]he agreement need not be explicit; it is sufficient if the conspirators knew or had reason to know of the scope of the conspiracy and that their own benefits depended on the success of the venture." *Sullivan*, 522 F.3d at 976 (internal quotation marks and citation omitted). Similarly, *Pinkerton v. United States*, 328 U.S. 640, 647 (1946), renders all co-conspirators criminally liable for reasonably foreseeable overt acts committed by others in furtherance of the conspiracy they have joined, whether they were aware of them or not. Thus, in our view, *Lopez* is not controlling where an alien smuggling conspiracy has been charged.

2

The problem the *Lopez* court confronted was bringing to offenses that were bound temporally to isolated acts. In *United States v. Singh*, 532 F.3d 1053, No. 07-30150 (9th Cir. July 17, 2008), we concluded that there was sufficient evidence of aiding and abetting on plain error review to sustain convictions under 8 U.S.C. § 1324(a)(2)(B)(ii). In so doing, we described the meager evidence of aiding and abetting the *Lopez* court examined:

> After completion of the "brings to" offense, Lopez twice spoke to a person who might have been the transporter. This fact alone, however, did not provide sufficient evidence of aiding and abetting because it could not establish that the defendant "knowingly and intentionally commanded, counseled, or encour-

aged the initial transporter to commit the 'brings to' offense." Similarly, merely showing that Lopez was associated with someone who was involved with a smuggling operation in some unknown way or that she was associated with the transportation of the aliens within the United States after the fact of smuggling was insufficient to show that she had the specific intent to bring about the "brings to" offense or that she knowingly and intentionally commanded, counseled, or encouraged the initial transporter to commit the "brings to" offense. We noted that a "brings to" conviction would be "particularly inappropriate" in *Lopez* because the district court found that "the defendant 'wasn't obviously the first choice'—'someone else was supposed to pick [the aliens] up,' " and Lopez was contacted "only after the aliens were already in the country and the plan for the first person to pick them up had been frustrated."

Slip Op. at 8817 (internal citations omitted).

Singh's involvement in the smuggling operation, we noted, "stood in stark contrast" to the evidence of participation described above. *Id.* at 8817-18. We concluded the jury's verdict could stand "on the basis of the other evidence that Singh agreed *ahead* of time not only to assist with secondary stateside transportation, but also to *return* to Vancouver after delivering [the illegal alien] to New York." *Id.* at 8818 (emphasis added).

*Singh* emphasizes what we have found sufficient to constitute aiding and abetting liability post-*Lopez*, and the infirmity of the substantive counts here simply was a function of the indictment and the dearth of evidence to support an aiding and abetting theory of a § 1324 violation involving the two aliens named in counts two and three. The law at the time of the indictment permitted the government to charge a brings to

offense on the basis of the intermediate or final destination theory, to which the language of counts two and three conform. *See Lopez*, 484 F.3d at 1191 n.7. Those counts were premised on the notion that Drewry and Hernandez were a critical part of the offenses because the aliens, under existing law, had not yet been "dropped off." They were still in the process of being "brought to" the United States — their final destination or some intermediate point had not been reached. *Lopez* rejected the final destination theory for a place of arrival theory.

**[24]** However, post-*Lopez*, because the superseding indictment was specific as to the identity of the aliens and the precise date when they crossed the border, the mere fact that Drewry and Hernandez had transported the aliens after they were "dropped off" was no longer sufficient to sustain their convictions. We are convinced that had the state of the law been clear, the government would have had no problem meeting its burden under an aiding and abetting theory as to different aliens previously smuggled. We are also convinced that the alien smuggling conspiracy as charged in the superseding indictment is broad enough and written in a way that avoids *Lopez* proof issues to support convicting both Drewry and Hernandez.

3

The conspiracy count reads as follows:

*Count 1*

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown to the grand jury and continuing up to and including on or about July 14, 2005, in San Diego County . . . and elsewhere, defendants NORMA HERNANDEZ-ORELLANA, MARITZA OLMEDA DREWRY, and CESAR

RAMOS-VASQUEZ, and others known and unknown to the Grand Jury, conspired and agreed with each other to commit the following offense against the United States:

To bring to the United States for the purpose of obtaining private financial gain, aliens, knowing and in reckless disregard of the fact that such aliens had not received prior official authorization to come to, enter, or reside in the United States, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii).

B.   MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE ACCOMPLISHED

The objects of the conspiracy were to be accomplished, in substance, as follows:

1.   Aliens who had not received prior official authorization to come to, enter, or reside in the United States, would meet with known and unknown co conspirators in Mexico to be smuggled into the United States in exchange for a payment of a fee.

2.   Known and unknown co-conspirators would smuggle the illegal aliens across the Mexican border into the United States.

3.   Defendant CESAR RAMOS-VASQUEZ and known and unknown co-conspirators would pick up the smuggled aliens after they crossed the border into the United States and transport and move the smuggled aliens to load houses, including a house located at 1262 Riviera Summit, San Diego, . . . where they would wait and be transported to their ultimate destination within the United States.

4. Defendants NORMA HERNANDEZ-ORELLANA, MARITZA OLMEDA DREWRY, and CESAR RAMOS-VASQUEZ would harbor, conceal, and shield from detection the smuggled aliens at the Load House until the aliens were transported and moved to another location within the United States en route to their ultimate destination.

5. Defendants NORMA HERNADEZ-ORELLANA and MARITZA OLMEDA DREWRY would transport and move the smuggled aliens from the Load House to another location within the United States en route to their ultimate destination.

C.   OVERT ACTS

In furtherance of said conspiracy and to effect and accomplish the objects thereof, the following overt acts, among others, were committed within the Southern District of California, and elsewhere:

1.   On or about or before June 19, 2005, unknown co-conspirators brought aliens [the "June Aliens"] across the Mexican border into the United States.

2.   On or about June 19, 2005, defendant NORMA HERNANDEZ ORELLANA transported and moved the June Aliens in a vehicle northbound on the Interstate 15 freeway.

3.   On or about July 14, 2005, known and unknown co-conspirators brought aliens, including Teresa Camarena-Reyes and Hector Contreras-Garcia [the "July Aliens"] across the Mexican border into the United States.

4.   On or about July 14, 2005, known and unknown co-conspirators transported the July Aliens to the Load House.

5.   On or about July 14, 2005, defendants NORMA HERNANDEZ-ORELLANA, MARITZA OLMEDA DREWREY, and CESAR RAMOS-VASQUEZ harbored concealed, and shielded from detection the July Aliens at the Load House.

6.   On or about July 14, 2005, defendants NORMA HERNADEZ-ORELLANA and MARITZA OLMEDA DREWREY instructed the July Aliens to exit the Load House and enter a vehicle.

7.   On or about July 14, 2005, defendants NORMA HERNANDEZ-ORELLANA and MARITZA OLMEDA DREWREY prepared to transport and move the July Aliens to another location.

8.   On or about July 14, 2005, defendant MARITZA OLMEDA DREWREY began transporting and moving the July Aliens in a vehicle from the Load House to another location.

All in violation of 18 U.S.C. § 371.

**[25]** The record in this case is replete with evidence of a widespread alien-smuggling conspiracy, which both defendants knowingly agreed to join, and whose scope included the on-going smuggling, harboring, and transporting of illegal aliens. The ledger that law enforcement officers uncovered in Hernandez's maroon Toyota SUV documented smuggling activities that spanned several days. The government introduced testimony that the ledger contained the names of various drivers, guides, as well as the market rate for smuggling aliens across the border. An alias that Drewry often used, "Diana," similarly was found in the ledger along with "x 10" and the date "7-07-2005." Evidence at trial confirmed that Drewry was responsible for arranging the transportation for ten undocumented aliens from Mexico into the United States on July 7, 2007.

The ledger identified additional illegal aliens for whom Drewry had organized cross-border transportation and accommodation at the load house. Included among that information was an undocumented alien who was smuggled on June 30, 2005, twelve aliens on July 1, 2005, two aliens on July 4, 2005, and three aliens on July 11, 2005. According to the ledger, Drewry also owed Hernandez approximately $9,000 for her role in transporting aliens. Similarly, a search of the garage at the load house revealed another journal, which documented the identity of numerous additional aliens transported across the border, foot guides, smugglers, and drivers. Finally, Border Patrol agents searched Drewry's purse and recovered an envelope with $1,600 — the market rate for smuggling an alien from Mexico into the United States.

From the testimony of witnesses, corroborated by information in the ledger and the journal and the incriminating acts and statements of the defendants, we are convinced that there is sufficient evidence from which a jury could have found beyond a reasonable doubt that Hernandez and Drewry entered into a criminal conspiracy which intended to bring aliens into the United States for financial gain and that all co-conspirators agreed with each other to do so. Neither Drewry nor Hernandez would have derived any monetary benefit had the undocumented aliens not been crossed in this case. Indeed, both Drewry and Hernandez largely furthered the aims of the conspiracy: they possessed the contacts with smugglers, guides, and drivers, arranged logistics, registered load vehicles in their names, directed the harboring and movement of aliens smuggled to the United States, and collected money, among others things.

As noted, the government had to prove and the jury was required to find that at least one overt act was taken in furtherance of the conspiracy. At least one of the overt acts alleged in the indictment encompassed extraterritorial conduct. Specifically, co-conspirators "brought aliens . . . across the Mexican border into the United States." Based on the evidence and

the language charged in the superseding indictment, the jury easily could have concluded that co-conspirators brought undocumented aliens across the border at which point either Drewry or Hernandez picked them up, harbored them temporarily in a safe haven, arranged for their transportation, or transported them on their way. The evidence presented at trial was more than sufficient to permit the jury to infer that Drewry's and Hernandez's compensation for their role in the alien smuggling operation depended *entirely* on the crossing of those illegal aliens.

## V

Sufficient evidence supports the jury's verdict that Drewry and Hernandez engaged in a conspiracy to bring illegal aliens from Mexico into the United States for financial gain and supports their convictions on the remaining counts save for the substantive bringing to offenses, counts two and three. We affirm their convictions on all counts but these two. We remand the matter for re-sentencing in light of our disposition. Because the advisory guidelines range was calculated taking into consideration conviction on these two counts, the sentence was procedurally erroneous. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc). Because we cannot conclude on this record that the district court would impose the same sentence on remand (though it is not restricted from doing so), we affirm in part as to all counts of conviction except counts two and three; reverse in part as to those two counts; vacate the sentences imposed; and remand for re-sentencing. *See id.*

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**.