**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
             *Plaintiff-Appellee,*

v.

ALBERTO NORIEGA-PEREZ,
             *Defendant-Appellant.*

No. 10-50501

D.C. No.
3:06-cr-02268-JM-2

OPINION

Appeal from the United States District Court
for the Southern District of California
Jeffrey T. Miller, Senior District Judge, Presiding

Submitted November 7, 2011*
Pasadena, California

Filed February 1, 2012

Before: Ferdinand F. Fernandez, Karen Nelson Moore,**
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman;
Partial Concurrence and Partial Dissent by Judge Moore

---

*The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

**The Honorable Karen Nelson Moore, United States Circuit Judge for the Sixth Circuit, sitting by designation.

915

## COUNSEL

Knut S. Johnson, Esq., San Diego, California, for the defendant-appellant.

Paul L. Starita, Assistant United States Attorney, United States Attorney's Office, San Diego, California, for the plaintiff-appellee.

**OPINION**

TALLMAN, Circuit Judge:

Defendant-Appellant Alberto Noriega-Perez ("Noriega") appeals his conviction by jury verdict on one count of conspiracy to bring illegal aliens to the United States for financial gain (8 U.S.C. § 1324(a)(2)(B)(ii); 18 U.S.C. § 371), one count of conspiracy to harbor illegal aliens (8 U.S.C. § 1324(a)(1)(A)(iii), (v)(I)), eighteen counts of aiding and abetting bringing illegal aliens to the United States for financial gain (8 U.S.C. § 1324(a)(2)(B)(ii); 18 U.S.C. § 2), and eighteen counts of aiding and abetting harboring illegal aliens (8 U.S.C. § 1324(a)(1)(A)(iii), (v)(II)). Noriega rented two properties he owned near the United States-Mexico border to an alien smuggling organization knowing that they would be used as load houses to conceal and later transfer recently arrived aliens.

United States Immigration and Customs Enforcement ("ICE") officers raided both properties and apprehended numerous illegal aliens found there. Of those apprehended, ICE identified eighteen as material witnesses. All eighteen material witnesses were named in the substantive counts of the operative indictment as persons brought into the United States from Mexico by the smuggling ring, but only eight testified at Noriega's trial.

On appeal, Noriega challenges the sufficiency of the evidence on two grounds.[1] First, he argues that there was insufficient evidence of alienage with respect to the ten material witnesses named in the indictment who did not testify at trial. Second, as to his conviction for aiding and abetting the bringing of illegal aliens to the United States for financial gain, he

---

[1] We address Noriega's other claims, as well as his *pro se* submissions to this Court, in a separate unpublished memorandum disposition filed simultaneously with this opinion.

contends that there was insufficient evidence linking him to the cross-border transportation of the named material witnesses before they were dropped in the United States, as required under our decision in *United States v. Lopez*, 484 F.3d 1186 (9th Cir. 2007) (en banc). We have jurisdiction, 28 U.S.C. § 1291, reject his arguments, and affirm.

I

In 2003, ICE Special Agent Donald Webster began investigating two properties owned by Noriega—the "McCabe" property and the "Alamo" property—located in Holtville, California, about ten miles from the United States-Mexico border. Noriega rented these properties to an alien smuggling organization for use as "load houses" (i.e., premises used to harbor and shield illegal aliens shortly after they have been smuggled across the border while they await transportation to their final destination). The smuggling operation was extensive. Noriega speculated to a cooperating informant wearing a body recorder that the organization renting his properties made over $1,000,000 smuggling illegal aliens. The confidential informant estimated that approximately 300 illegal aliens per month were harbored at the McCabe property, with each alien paying a fee of about $1,500 to $2,000. Surveillance videos taken of the Alamo property show numerous pickup trucks arriving and departing, as well as people being loaded onto the back of trucks and then covered with tarps. On one occasion, ICE agents attempted to stop one of the trucks leaving the Alamo property; after a high-speed chase and abandonment of the vehicle by the driver, twelve or thirteen alleged aliens were found lying on top of each other in the bed of the truck.

Noriega was well aware that he was renting his properties so that they could be used as load houses. He lived at the McCabe property with his mother while it was being used as a load house, and often ate his meals with illegal aliens being held there. In negotiating the rental of the Alamo property

(the conversation that was recorded by the cooperating informant), Noriega estimated that the garage on the property was big enough to hold fifty to sixty "illegals." In another recorded conversation, Noriega recounted detailed information about the smuggling organization, including the activities of various members and certain records that had recently been lost. A surveillance video taken in April 2005 shows Noriega erecting aluminum siding along the chain-link fence surrounding the Alamo property, which the Government urged the jury to believe was done to obstruct from plain view the smuggling activities taking place there.[2]

On October 11, 2005, federal agents executed a search warrant at the McCabe property. The agents apprehended approximately seventy-four suspected aliens, most of whom were found crowded in a warm, unlit room in a trailer located on the property. Nine were retained as material witnesses. On November 7, 2005, agents executed a second search warrant at the Alamo property and discovered another thirty-eight suspected aliens inside the garage. Nine were retained as material witnesses.

Noriega was indicted on October 18, 2006. The Government ultimately pursued one count of conspiracy to bring illegal aliens to the United States for financial gain, one count of conspiracy to harbor illegal aliens, eighteen counts of aiding and abetting the bringing of an illegal alien to the United States for financial gain, and eighteen counts of aiding and abetting the harboring of an illegal alien. In the operative indictment, each of the substantive counts named one of the eighteen material witnesses apprehended during the raids at

---

[2]The defense argued in reply that the aluminum siding was erected during daylight hours and was not tall enough to completely block the view onto the property. In reviewing the sufficiency of the evidence, we draw all reasonable inferences in the light most favorable to support the jury's verdict. *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1201-02 (9th Cir. 2000) (citation omitted).

the Alamo and McCabe properties. All substantive counts were charged as overt acts in furtherance of the alien smuggling conspiracy.

At Noriega's trial, Special Agent Webster explained the process used to identify material witnesses and then listed the names of the eighteen material witnesses named in the operative indictment. Only eight of the eighteen material witnesses testified. In relevant part, each testified that he or she did not have permission to enter the United States, but arranged to do so by paying the smugglers fees ranging from $1,500 to $2,500. Each alien was guided across the border and then brought to either the McCabe or Alamo property, where each was apprehended by ICE. Most had been at the load house for only a brief period of time (between a few hours and three days), although one witness testified that he was at the McCabe property for eleven to twelve days. None recognized Noriega or identified any of the non-testifying material witnesses.

ICE Officer Frances Bench testified regarding the structure and operation of an alien smuggling organization. Officer Bench explained to the jury that a recruiter identifies customers, i.e., aliens willing to pay to be smuggled into the United States. A guide escorts illegal aliens through or between ports of entry into the United States. Sometimes the guide takes the illegal aliens directly to a load house; other times, a driver meets the guide at a specific pick-up location in the immediate border area, who in turn transports the illegal aliens to a nearby load house. Because illegal aliens are brought there shortly after entering the United States while they await transportation to their final destination, the load house needs to be located in close proximity to both the border area and major transportation corridors, such as highways and interstate freeways.

Illegal aliens generally remain at the load house for a few hours to a couple of days, unless there is a delay in the pay-

ment of the smuggling fee. They are then transported to their final destination. Officer Branch explained that smuggling is a for-profit endeavor, and smuggling fees are used to pay all of the organization's members for the services they provide.

Noriega was convicted on all counts and sentenced to sixty months imprisonment on each count, to run concurrently.

## II

We review de novo Noriega's sufficiency of the evidence claims, which he raised below, and ask whether, "viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shipsey*, 363 F.3d 962, 971 n.8 (9th Cir. 2004) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Noriega argues that there was insufficient evidence of (1) alienage to support his conviction on the substantive counts naming non-testifying material witnesses, and (2) an extraterritorial connection to support his conviction of aiding and abetting bringing aliens to the United States. We address and reject each of Noriega's sufficiency arguments in turn.

## A

On the thirty-six substantive counts, the Government had the burden of proving that each of the material witnesses named in the indictment was an illegal alien. 8 U.S.C. § 1324(a)(1)(A)(ii)-(iii), (B)(ii). There is no dispute that the Government met this burden on the sixteen counts naming one of the eight material witnesses who testified at trial. Noriega challenges the sufficiency of the evidence of alienage on the twenty counts naming a non-testifying material witness.

**[1]** At trial, the Government argued that, based on the testimony by eight of the material witnesses that they entered the

United States without permission, the jury could reasonably infer that the non-testifying material witnesses lacked permission to enter the country as well. There was nothing improper in the jury making such an inference. We have previously approved of inferring facts about non-testifying aliens based on the testimony of similarly-situated aliens. In *United States v. Tsai*, 282 F.3d 690 (9th Cir. 2002), the defendant was convicted on three counts of aiding and abetting bringing an illegal alien to the United States for financial gain based on evidence that he made travel arrangements and escorted illegal aliens into the United States on three separate occasions. *Id.* at 694. One of the aliens testified at trial that a family member paid for her transport and escort by the defendant on one of the trips. *Id.* at 697. In finding sufficient evidence of pecuniary motive on all three counts, we explained that "the fact that all three trips followed almost exactly the same pattern gives rise to an inference that" the non-testifying aliens smuggled by the defendant into the United States on the other two trips also paid for their transport and escort. *Id.* at 697.

**[2]** Noriega argues that the Government somehow improperly shifted the burden of proof of alienage to the defense by relying on a similar inference in this case, instead of simply retaining all alleged aliens so that they could testify themselves and be subject to cross-examination. We see no basis for creating a *per se* rule that any time alienage is an element of a crime, the alleged alien who was the subject of the offense must testify. That would be akin to holding that only direct evidence of the crime may be admitted to prove the case. *See United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990) ("[C]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned." (internal quotation marks and citation omitted)). In fact, we have previously held that circumstantial evidence may suffice. *United States v. Hernandez-Orellana*, 539 F.3d 994, 1002-03 (9th Cir. 2010) (finding sufficient evidence of

alienage even though the alleged aliens did not testify). Certainly in some cases the Government may find itself without sufficient evidence of alienage (direct or circumstantial) following the deportation of the alleged alien. If so, a wrongly-convicted defendant would have a meritorious sufficiency of the evidence claim.

To require testimony by every alleged alien would run afoul of the political branches' authority to regulate immigration. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982). As the Supreme Court has explained, "prompt deportation of alien witnesses who are determined by the Government to possess no material evidence relevant to a criminal trial . . . satisf[ies] immigration policy" and mitigates the "substantial financial and physical burdens upon the Government, not to mention the human cost to potential witnesses who are incarcerated though charged with no crime." *Id.* at 865. Consequently, the deportation of an alien does not violate a defendant's constitutional rights absent a showing of prejudice and bad faith. *Id.*[3]

**[3]** Seemingly underlying Noriega's burden-shifting argument is the fact that the Government relied on the eight material witnesses' testimony to convict him on sixteen counts naming those witnesses, in addition to the twenty counts naming non-testifying material witnesses. But the Government's decision to prosecute Noriega on counts naming both testifying and non-testifying witnesses falls squarely within its prosecutorial discretion and has no impact on our decision today.[4]

---

[3]We reject Noriega's separate claim that the release of material witnesses, in and of itself, violated his constitutional rights in the unpublished memorandum disposition issued concurrently with this opinion. *See* n.1 *supra*.

[4]Ultimately, the Government's decision to prosecute Noriega on separate substantive counts for each and every material witness did not impact the length of Noriega's sentence because the district court imposed the same 60-month term of imprisonment on each count, to run concurrently with the sixty-month conspiracy conviction.

The jury was properly instructed that the Government had the burden of proving the alienage of each of the material witnesses named in the indictment. There is nothing to suggest that the jury believed that if it convicted Noriega on the counts naming testifying material witnesses, it had no choice but to convict on the counts naming non-testifying material witnesses. Thus, the question before us today is whether there was otherwise sufficient direct and circumstantial evidence of alienage to support Noriega's conviction on the counts naming non-testifying alleged aliens—not whether the same evidence was also used to convict him on other counts.

**[4]** We conclude that the evidence of alienage was sufficient. All of the material witnesses were apprehended at the same times and in the same cramped quarters at the same known load houses. Eight of those material witnesses testified that they lacked permission to enter the United States. A jury could reasonably infer that the others did as well. This is no different than the inference we endorsed in *Tsai*.

**[5]** Moreover, there was additional circumstantial evidence of alienage beyond the eight material witnesses' testimony. The material witnesses were apprehended under circumstances that strongly suggested they had recently been smuggled into the United States and awaited further transportation. In particular, the material witnesses were found crowded together with dozens of others in cramped quarters on the Alamo and McCabe properties. It bears repeating that there was substantial, uncontroverted evidence that those properties were being used to harbor and conceal a steady stream of illegal aliens by a smuggling enterprise that moved more than 3,000 aliens a year across our border with Mexico.

These circumstances stand in stark contrast to the facts in *United States v. Camacho-Davalos*, 468 F.2d 1382 (9th Cir. 1972), where we found insufficient evidence of alienage. There, the border patrol stopped and searched a truck, which was traveling close to a station wagon on a highway about 75

miles north of the Mexican border. *Id.* at 1383. The agent who searched the truck testified that "all of the people in the truck were 'Mexican appearing,' spoke Spanish, and did not produce immigration papers on request." *Id.* at 1383. In finding that the agent's testimony alone was not sufficient evidence that three of the passengers in the truck were illegal aliens, we noted that the agent's description of the alleged aliens "fits thousands of American citizens." *Id.*

**[6]** The same cannot be said here. Few, if any, American citizens or legal aliens would ever be found with dozens of others crowded inside a dimly-lit garage or a room in a trailer being rented by a vast trafficking enterprise to harbor recently-smuggled illegal aliens.[5] Viewed in the light most favorable to the Government, the strong circumstantial evidence presented at Noriega's trial sufficed for the jury to find beyond a reasonable doubt that the non-testifying material witnesses were illegal aliens.

## B

**[7]** Noriega also contends that there was insufficient evidence to support his conviction of aiding and abetting "[a]ny person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien," 8 U.S.C. § 1324(a)(2). As noted above, we held in *Lopez* that a "brings to" offense "ends when the person who transports the aliens to the country terminates his act of trans-

---

[5]Noreiga also relies on *United States v. Ortiz-Lopez*, 24 F.3d 53 (9th Cir. 1994), where we held that no reasonable jury could find *beyond a reasonable doubt* that the defendant was an illegal alien based solely on a prior deportation order, which issued under a *clear and convincing* standard. *Id.* at 56. Here, the circumstantial evidence relied on by the Government "does not implicate the burden-shifting or standards of proof problems of *Ortiz-Lopez*." *United States v. Barajas-Montiel*, 185 F.3d 947, 955 (9th Cir. 1999).

portation and drops off the aliens" on the United States side of the border. 484 F.3d at 1191. Thus, the defendant in *Lopez* could not be held directly liable for a "brings to" offense because she "encountered the aliens and provided them with transportation only after they had been dropped off in the United States." *Id.* at 1198.

**[8]** But we left no doubt that a defendant could aid and abet a "brings to" offense entirely from within the United States:

> It is clear that under certain circumstances a defendant who does not physically transport aliens across the border may be held criminally liable for aiding and abetting a "brings to" offense. A financier who organizes and funds a smuggling operation, for example, whether located in or outside of the United States, may be said to have "associate[d] himself with the venture, . . . participate[d] in it as in something he wishe[d] to bring about, [and sought] by his action to make it succeed."

*Id.* at 1199 (citations omitted).

Such a theory did not support the conviction in *Lopez*, where the defendant was a substitute driver who was called after the aliens were already in the United States. *Id.* at 1200-01. We explained that evidence that the defendant had twice spoken to a person who might have been the initial guide, put the vehicle used to transport the aliens in her name, traveled near the border to pick up the vehicle, and could describe the initial guide merely suggested that the defendant had prior contact with the guide and did not rise to the level of sufficient evidence. *Id.* at 1200.

Since *Lopez*, we have explained that general participation in smuggling activities alone is not sufficient to establish that a defendant aided and abetted the cross-border transportation

of a specific alien. There must be a nexus between the defendant's smuggling activities and the cross-border transportation of the specified alien. In *Hernandez-Orellana*, we found insufficient evidence linking the aliens named in the indictment to the defendants, Maritza Drewry and Norma Hernandez-Orellana, to support their liability for conduct that occurred before the "brings to" offense terminated. 539 F.3d at 1006. While the evidence

> revealed that Drewry had some connection to transporting aliens as a general matter, . . . Drewry had discussed where to bring aliens within the United States in general terms, Drewry would take and bring aliens to different locations as a general proposition, and Hernandez's vehicle was used to take [the named aliens] from some point in the United States to [a] residence, there [was] no specific evidence linking Drewry and Hernandez to intentionally aiding, counseling, commanding, inducing or procuring the cross-border transportation of [the named aliens], prior to when these aliens were dropped off in the United States.

*Id.* (internal quotation marks and citation omitted). *But see United States v. Flores-Blanco*, 623 F.3d 912, 920-22 (9th Cir. 2010) (finding sufficient evidence of extraterritorial conduct where the defendant had coordinated surveillance of the border, repositioned himself a short distance from the border fence as the illegal alien approached, and then waved the alien across).

**[9]** In *United States v. Reyes-Bosque*, 596 F.3d 1017 (9th Cir. 2010), we addressed the sufficiency of the evidence of aiding and abetting a "brings to" offense where the defendant provided a load house and held that the evidence "sufficiently demonstrate[d] that [the defendant] was connected to conduct that occurred before the entry of illegal aliens to the United States." *Id.* at 1036. We explained that the "key evidence"

was testimony by an illegal alien that the initial cross-border guide dropped him off at an apartment furnished by the defendant for use as a load house. *Id.*

**[10]** Like the defendant in *Reyes-Bosque*, Noriega provided the load houses where the named material witnesses were taken. Several of the named material witnesses testified that they were brought directly to either the Alamo or McCabe property by their initial cross-border guide. Noriega was paid for use of his load houses, erected fencing to shield the true nature of their usage from discovery, and knew he was part of a large smuggling venture that brought an average of 300 illegal aliens a month through his properties. This evidence is sufficient to support Noriega's conviction on those "brings to" counts under an aiding and abetting theory of liability.

True, at least some of the substantive "brings to" offenses terminated before the named alien arrived at Noriega's properties. In particular, a few of the material witnesses testified that they were initially dropped somewhere in the United States before being transported by someone else to the load house. And, of course, we have no way of knowing whether the same was true for the non-testifying material witnesses. Nevertheless, there was sufficient evidence for the jury to reasonably conclude that by providing the load houses, Noriega knowingly, actively, and intentionally aided this large smuggling enterprise's cross-border transportation and safe housing of these material witnesses as well.

A "successful" smuggling organization must have one or more established load houses, at least in part, to avoid detection. Such an operation requires a place where large numbers of aliens can be concealed shortly after they cross the border in order for there to be sufficient time to ensure that all smuggling fees have been paid and to coordinate travel to the final destination. Not just any property will suffice as a load house. Agent Bench emphasized the importance of the geographic

location of an ideal load house: it must be close to both the border area and major transportation corridors. Noriega's two properties fit the bill.

In this way, this appeal differs from our prior cases like *Lopez* and *Hernandez-Orellana*, which addressed intra-United States drivers. Unlike a load house, drivers themselves are fungible and need not be in place before an alien is smuggled across the border. The particular driver on any leg of a trip may change and, as in *Lopez*, often at the last minute. For that reason, the mere fact that an alien is found in a car with the defendant after the termination of the "brings to" offense is not itself sufficient to find that the defendant aided and abetted the cross-border transportation of that alien. *Hernandez-Orellana*, 539 F.3d at 997.

The Alamo and McCabe properties were established as load houses long before any of the material witnesses were dropped on the United States side of the border. Special Agent Webster testified that ICE surveillance of smuggling activities at those properties began as early as 2003, years prior to the raids. Noriega's properties fit the specific parameters required of a load house. Both properties are located within ten miles of the border and have easy access to major highways. Both also have structures allowing for concealment of large numbers of smuggled aliens and view-obstructed passageways for vehicles to enter and exit the property.

It is beyond dispute that Noriega knew his properties were being used as load houses. More than that, Noriega was intimately aware of the inner-workings of the alien smuggling business and, as such, a jury could reasonably infer that he would have understood the importance to a smuggling organization of establishing and maintaining an effective load house. Indeed, Noriega took the additional step of erecting siding on the fence surrounding the Alamo property, which provided greater concealment of the illegal activities occurring behind it.

We also note that there is a clear nexus between Noriega's involvement in general smuggling activities and the "brings to" offenses. Namely, each of the material witnesses was apprehended at one of Noriega's properties. Noriega's provision of load houses to the smuggling organization is thus directly linked to the cross-border transportation of the particular aliens named in the indictment and was an integral part of the organization's illegal scheme.

The dissent expresses concern that under our holding today, a load house owner could be guilty of aiding and abetting the cross-border transportation of any alien brought to his property, regardless of the passage of time and involvement of numerous load houses and transporters following the termination of the actual "brings to" offense. But the record in this case supports the jury's rejection of the dissent's speculation regarding the events leading up to the apprehension of the material witnesses. Agent Bench testified that after being smuggled across the border, aliens are brought to a nearby load house, either by the initial transporter or a second transporter. The eight material witnesses' trial testimony was in accord. Some were brought directly to one of Noriega's properties by the initial cross-border transporter. The remaining were picked up in a car by a second transporter and driven to one of Noriega's properties. None of the material witnesses spent any time at any other property. The evidence sufficed for the jury to find that all of the aliens apprehended at Noriega's properties were brought there directly or shortly after crossing the border as part of the smuggling plan.

Based on his incriminating admissions captured on tape recordings, and his erection of the fencing on his property, a reasonable jury could find Noriega was no innocent landlord. Of course, we in no way foreclose the possibility that under different facts, a defendant's load house would be too far attenuated from the initial border crossing to support aiding and abetting liability.

**[11]** In sum, the jury could reasonably find that Noriega rented the Alamo and McCabe properties well knowing they would be used as load houses long before the named material witnesses were brought across the border. Noriega provided an essential component of the alien smuggling operation and, in so doing, knowingly and intentionally aided in bringing about the smuggling of the named material witnesses into the United States. Accordingly, a reasonable jury could find sufficient "specific evidence" linking Noriega to "intentionally aiding . . . the cross-border transportation" of the named material witnesses prior to when they were dropped off in the United States. *See Hernandez-Orellana*, 539 F.3d at 1006.

AFFIRMED.

---

MOORE, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority's holding in Part II.A on the issue of alienage. I also concur with the Memorandum Disposition. I dissent from Part II.B because I do not agree that Noriega-Perez's convictions for aiding and abetting a "brings to" offense should stand where the evidence clearly demonstrates that the cross-border transportation of a specific material witness terminated before any connection between Noriega-Perez and that alien occurred.

Noriega-Perez was charged with eighteen counts of aiding and abetting "brings to"[1] offenses under 8 U.S.C.

---

[1] This Circuit uses the phrase "brings to" and "bringing to" interchangeably to describe violations of § 1324(a)(2). *United States v. Lopez*, 484 F.3d 1186, 1188 n.1 (9th Cir. 2007) (en banc). Four types of conduct are prohibited in 8 U.S.C. § 1324: "(1) bringing an alien to the United States; (2) transporting or moving an illegal alien within the United States; (3) harboring or concealing an illegal alien within the United States; and (4) encouraging or inducing an illegal alien to enter the United States." *Id.* at 1190-91.

§ 1324(a)(2)(B)(ii) and 18 U.S.C. § 2. A different alien was named as the material witness in each count. To be guilty of aiding and abetting a "brings to" offense, the defendant must provide some assistance to the transporters of a named alien *before* the termination of the underlying offense. Otherwise, the requisite extraterritorial nexus is lacking. A "brings to" offense does not terminate upon the alien crossing the border into the United States, however, even though that is the point at which all of the statutory elements are satisfied. *United States v. Lopez*, 484 F.3d 1186, 1192 (9th Cir. 2007) (en banc). Termination of a "brings to" offense occurs when "*the initial transporter* drops the aliens off at a location in the United States." *Id.* at 1194 (emphasis added). A person whose activities are entirely domestic may be guilty of aiding and abetting a "brings to" offense if he induces or commands the principal to bring the alien across the border, *id.* at 1199-1200, or if he provides any assistance to the principal regarding the transportation of the alien before the offense terminates, *United States v. Reyes-Bosque*, 596 F.3d 1017, 1036 (9th Cir. 2010) (holding operator of load house aided and abetted an alien's crossing because the "bringing to" offense did not terminate until the alien arrived at his building), *cert. denied*, 131 S. Ct. 898 (2011).

This Circuit on numerous occasions has rejected the use of general participation in smuggling activities alone to establish that a defendant aided and abetted the cross-border transportation of a specific alien. In *United States v. Singh*, the court began its analysis by noting that the strong evidence of the defendant's general involvement in smuggling and his engagement in general preparatory work was insufficient on its own to establish aiding and abetting a "brings to" offense for a specific alien. 532 F.3d 1053, 1058-60 (9th Cir. 2008). However, upon the showing of a nexus between the defendant's general preparatory work and the "bringing to" of the alien—in Singh's case a telephone conversation in close proximity to the alien's arrival, during which the defendant agreed to drop the alien off somewhere else in the United States and

to return the passport for a fee—the evidence became sufficient to establish that the defendant's aid in the alien's crossing came before the "brings to" violation terminated, even though the defendant did not physically pick up the alien until after the border crossing was complete. *Id.* at 1060-61.

In *United States v. Hernandez-Orellana*, the government again had indisputable evidence that the co-defendants participated in the general smuggling of illegal aliens. 539 F.3d 994, 1005-06 (9th Cir. 2008). One of the defendants was found with a ledger keeping track of the many aliens whom she had helped cross the border, the dates of their crossings, and the rates for crossings, and someone had overheard the defendants discussing the potential smuggling of other unnamed aliens. The defendants were arrested together when they were found leaving a load house in the United States with two illegal aliens in the car. *Id.* at 997. Both defendants were charged with, among other counts, aiding and abetting the "bringing to" of those two specific aliens—Garcia and Reyes. This court held that the overwhelming general evidence of cross-border smuggling was insufficient to support the conviction of aiding and abetting the "bringing to" of those two aliens, because the defendants' sole connection to Garcia and Reyes was that they were in the car when the defendants were stopped and detained:

> Problematically for the government here, however, counts two and three specifically identify the aliens who were allegedly "brought to" the United States. The evidence presented to the jury stops short of linking those aliens to [the defendants] that would support their liability for conduct that occurred *before* the bringing to offense terminated. Significantly, the ledger and the journal make no reference to [the named] aliens Garcia or Reyes at all.

*Id.* at 1005. Because the government failed to provide "specific evidence linking [the defendants] to intentionally aiding,

counseling, commanding, inducing or procuring the cross-border transportation *of Reyes and Garcia*, prior to when these aliens were dropped off in the United States," the evidence was insufficient to support a conviction for aiding and abetting the offense of bringing those aliens to the United States. *Id.* at 1006 (internal quotation marks and alterations omitted) (emphasis added).

Noriega-Perez was similarly charged with aiding and abetting the cross-border transportation of eighteen specific, named aliens. Of the eight material witnesses to testify, some stated that upon crossing the border they were first unloaded at one of Noriega-Perez's properties. For these aliens, I agree with the majority that the evidence was sufficient to establish that Noriega-Perez aided and abetted their "bringing to" the United States, because his assistance came before the "bringing to" offense had terminated. *See Reyes-Bosque*, 596 F.3d at 1036. Other material witnesses, however, testified that they spent various periods of time at other properties before someone else transported them to Noriega-Perez's property. The majority concedes that these aliens were brought to Noriega-Perez's property *after* the "brings to" offense had unquestionably terminated, but nonetheless the majority concludes that the evidence sufficiently linked Noriega-Perez to their cross-border transportation before termination. The majority does not dispute that there must be sufficient evidence linking Noriega-Perez to the cross-border transportation of each of the named material witnesses before the offense terminated, but, despite this acknowledgment, the majority relies solely on Noriega-Perez's general participation in the smuggling ring and the fact that the aliens were arrested on Noriega-Perez's property to hold that the evidence was sufficient for those witnesses whose border crossings indisputably terminated before they arrived at his house. I cannot agree.

As was true for the defendants in *Hernandez-Orellana*, *Singh*, and *Reyes-Bosque*, Noriega-Perez was undeniably involved in general smuggling activities before the cross-

border transportation of each material witnesses occurred. As the majority correctly notes, Noriega-Perez's load houses were part of a large smuggling organization bringing illegal aliens to the United States. He understood that his houses were an integral part of this organization, and he knew that the houses were harboring illegal aliens.[2] None of the evidence cited by the majority, however, makes any reference to any of the specific material witnesses whose crossings Noriega-Perez was charged with assisting until after they were brought to the United States. For those who arrived at Noriega-Perez's load house after their initial transportation to the United States terminated, this deficiency is fatal, as it was in *Hernandez-Orellana*. The majority relies heavily on the fact that this was a load house and not a form of transportation to distinguish it somehow from *Hernandez-Orellana* and *Lopez*. I have found no support for this distinction. As was the case in *Reyes-Bosque*, even operators of load houses must have some pre-termination nexus to be guilty of aiding and abetting the cross-border transportation of an alien. 596 F.3d at 1036.[3] I do not agree that post-termination presence on Noriega-Perez's property satisfies that requirement.

---

[2]For this reason and the reasons set forth in the Memorandum Disposition, Noriega-Perez's challenge to the count for conspiracy to bring aliens to the United States also fails, as the conspiracy count does not name or otherwise rely on the "bringing to" of any specific aliens. *See also Hernandez-Orellana*, 539 F.3d at 1008-09 (affirming conspiracy conviction for bringing aliens to the United States despite reversing convictions for two of the underlying substantive offenses).

[3]The *Reyes-Bosque* opinion is unusual in that it addresses the sufficiency of the evidence argument with respect to only one of the four counts for aiding and abetting a "brings to" offense, perhaps because the government focused its argument on that one alien in its brief on appeal. I do not view the court's lack of discussion of the other three aliens in *Reyes-Bosque* as creating a holding that we must impute an extraterritorial nexus to all material witnesses upon a showing that the nexus existed for one material witness, as that issue was not clearly before the court. Nor does the majority urge that approach today. I agree with the majority that the key evidence in *Reyes-Bosque* to support the defendant's conviction for aiding and abetting a "brings to" offense was the testimony of the alien that his initial transporter dropped him off at the defendant's load house such that the offense had not yet terminated. *See Reyes-Bosque*, 596 F.3d at 1036.

The limitations set forth in current precedent are not without good reason. Under the majority's view, a load house owner is guilty of aiding and abetting the cross-border transportation of any illegal alien found on his property at any point, so long as he knew and understood the purpose of his house was to hold illegal aliens on behalf of the organization. If that same organization brings an alien to Texas, keeps him there for thirty days on someone else's property, and then decides to have yet another person bring him to Noriega-Perez's property in California, Noriega-Perez would be guilty, under the majority's view, of aiding and abetting the cross-border transportation of that alien. The alien could be brought to ten different properties in the United States, using ten different drivers, and so long as he eventually ends up at Noriega-Perez's load house, Noriega-Perez has aided and abetted, under the majority's theory, the cross-border transportation of that alien. This sweeping approach is not consistent with Congress's clear intent to create separate crimes for bringing an alien to the United States and for harboring an alien in the United States. *See* 8 U.S.C. § 1324 (a)(1)(A)(iii) (separately criminalizing harboring or concealing an illegal alien within the United States); *Lopez*, 484 F.3d at 1196 (emphasizing "clear statutory distinction" between each of the § 1324 crimes). *Hernandez-Orellana* wisely distinguished the act of aiding and abetting an alien's cross-border transportation from situations factually insufficient for the application of this statute, and I see no reason to depart from that well-drawn line today.

I would therefore affirm Noriega-Perez's convictions for aiding and abetting the cross-border transportation of any of the material witnesses who were initially dropped at one of his load houses and reverse his convictions for aiding and abetting the cross-border transportation of those aliens whose cross border transportation terminated before reaching

Noriega-Perez's property.[4]

---

[4]For the ten material witnesses who did not testify, I would deem the evidence insufficient to establish the requisite nexus. In reviewing a jury verdict, we must give the government the benefit of all reasonable inferences that can be drawn from the evidence and resolve all conflicts in the government's favor. *United States v. Nevils*, 598 F.3d 1158, 1163-64 (9th Cir. 2010) (en banc). However, the evidence remains insufficient where there is a "total failure of proof." *Id.* at 1167 (quoting *Briceno v. Scribner*, 555 F.3d 1069, 1079 (9th Cir. 2009)) (alteration in original). An inference on the issue of alienage was reasonable because the non-testifying witnesses were all apprehended under similar circumstances as those who testified, who in turn were all in the United States without permission. However, there was no evidence presented to support an inference that the non-testifying material witnesses were *transported* in the same manner as certain of the testifying witnesses but not the others. Because such an inference would not be reasonable on the evidence, I would reverse Noriega-Perez's convictions for those counts involving the non-testifying witnesses as well.